Thomas W. JANDRE and Barbara J. Jandre,
Plaintiffs-Respondents,

v.

WISCONSIN INJURED PATIENTS AND
FAMILIES COMPENSATION FUND,
Defendant-Co-Appellant,

PHYSICIANS INSURANCE COMPANY of Wisconsin
and Therese J. Bullis, M.D.,
Defendants-Appellants-Petitioners.

Thomas W. JANDRE and Barbara J. Jandre,
Plaintiffs,

v.

WISCONSIN INJURED PATIENTS AND
FAMILIES COMPENSATION FUND,
Defendant-Respondent,

PHYSICIANS INSURANCE COMPANY of Wisconsin
and Therese J. Bullis, M.D.,
Defendants-Appellants-Petitioners.

Supreme Court

*No. 2008AP1972. Oral Argument September 16, 2011.
—Decided April 17, 2012.*

2012 WI 39

(Also reported in 813 N.W.2d 627.)

33

38

40

41

For the defendants-appellants-petitioners, there were briefs filed by *Michael B. Van Sicklen* and *Krista J. Sterken,* and *Foley & Lardner, LLP,* Madison, and oral argument by *Michael B. Van Sicklen.*

For the plaintiffs-respondents there was a brief filed by *Linda V. Meagher, Dana J. Weis, James M. Fergal,* and *Habush, Habush & Rottier, S.C.,* Waukesha, and oral argument by *Dana J. Weis.*

An amicus curiae brief was filed by *Lynn R. Laufenberg* and *Laufenberg, Stombaugh & Jassak, S.C.,*

Milwaukee, and *William C. Gleisner, III*, Hartland, on behalf of the Wisconsin Association for Justice.

Amicus curiae briefs were filed by *Guy DuBeau*, and *Axley Brynelson, LLP*, Madison, on behalf of the Wisconsin Medical Society, Inc., the Wisconsin Hospital Association, Inc. and the Wisconsin Chapter of the American College of Emergency Physicians, Inc.

An amicus curiae brief was filed by *William F. Bauer* and *Karen M. Gallagher*, and *Coyne, Schultz, Becker & Bauer, S.C.*, Madison, on behalf of Dean Health System, Inc., Marshfield Clinic and Gundersen Lutheran Health System, Inc.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of a published decision of the court of appeals in a medical malpractice case.[1] The court of appeals affirmed a judgment of the Circuit Court for Fond du Lac County, Robert J. Wirtz, Judge, entered on a jury verdict in favor of Thomas W. Jandre (Jandre) and his wife, Barbara J. Jandre (collectively, the Jandres), against Dr. Therese J. Bullis and her insurer, Physicians Insurance Company of Wisconsin (collectively, PIC) and the Wisconsin Injured Patients and Families Compensation Fund (the Fund). PIC seeks review, but the Fund does not.

¶ 2. We briefly put the issue presented and PIC's position in context. The Jandres asserted two claims: (1) Dr. Bullis negligently diagnosed Jandre with Bell's palsy; and (2) Dr. Bullis breached her duty to

---

[1] *Jandre v. Physicians Ins. Co. of Wis.*, 2010 WI App 136, 330 Wis. 2d 50, 792 N.W.2d 558.

Justice Bradley and Justice Crooks join this opinion. Justice Prosser concurs in the decision to affirm the court of appeals and circuit court, but is unable to join this opinion.

inform a patient under Wis. Stat. § 448.30 (2007–08),[2] by failing to inform Jandre of a diagnostic test (a carotid ultrasound) that was available to rule out the possibility of a stroke. Stroke was one of several conditions that was included in Dr. Bullis's differential diagnosis[3] but it was not in her final diagnosis.

¶ 3. The jury found that Dr. Bullis's diagnosis of Bell's palsy was not negligent and also found that Dr. Bullis was negligent with respect to her duty to inform the patient.[4] The circuit court entered judgment on the verdict, and the court of appeals affirmed the judgment.

¶ 4. PIC presents the issue as follows: Is there a bright-line rule that once a physician makes a non-negligent final diagnosis, there is no duty to inform the patient about diagnostic tests for conditions unrelated to the condition that was included in the final diagnosis? Stating the issue in terms of the facts of the present case, PIC asks: When a jury in a medical malpractice case finds that the emergency room physician was not negligent in the diagnosis of Bell's palsy, may a jury find a breach of the duty to inform when the physician fails

---

[2] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[3] "Differential diagnosis" usually refers to a diagnostic process in which a physician begins by creating a list of diseases or ailments that he or she believes might possibly be causing the patient's symptoms. In our discussion, we follow the parties' lead and use "differential diagnosis" to refer to the initial list of possible diseases, as opposed to "final diagnosis," which is the disease the physician determines is causing the patient's symptoms.

[4] The circuit court concluded that credible evidence supported the jury's findings and denied the defendants' motion to change the verdict. PIC is no longer challenging the sufficiency of the evidence with respect to the informed consent verdict.

to advise the patient about the availability of a non-invasive diagnostic tool (a carotid ultrasound) that might definitively rule out a stroke (a condition that appeared in the differential diagnosis and is unrelated to the final diagnosis of Bell's palsy), when the physician ruled out a stroke by a less reliable diagnostic tool?

¶ 5. PIC answers these questions in the negative and urges us to adopt a bright-line rule. PIC asserts that, as a matter of law, a physician has no duty to inform the patient about conditions unrelated to the condition identified in the physician's non-negligent diagnosis, and that the facts in the present case are so clear that as a matter of law the circuit court had to find Dr. Bullis not negligent on the claim of breach of duty to inform rather than let the jury decide the question.

¶ 6. PIC argues that the circuit court and court of appeals expanded a physician's duty to inform beyond what Wisconsin courts have previously recognized. PIC asks the court to reverse the decision of the court of appeals, vacate the jury's verdict, and vacate the award of damages on the informed consent claim.

¶ 7. We affirm the decision of the court of appeals by applying the reasonable patient standard (sometimes referred to as the "prudent patient" standard), which Wisconsin has explicitly followed in informed consent cases since at least 1975.[5] The doctrine of *stare decisis* governs the present case.

■■

¶ 8. Under the reasonable patient standard, "Wisconsin law 'requires that a physician disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treat-

[5] *See Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975).

ment or diagnosis.' "[6] The reasonable patient standard requirement of disclosure "is rooted in the facts and circumstances of the particular case in which it arises."[7] The bright-line rule PIC urges is incompatible with the reasonable patient standard adopted by the legislature in Wis. Stat. § 448.30 and explained in case law.

¶ 9. "[T]he informed consent standard . . . [i]s an objective standard based on negligence principles such as reasonableness . . . ."[8] Thus, the physician's "duty to inform is not boundless."[9]

¶ 10. Applying the reasonable patient standard to the facts and circumstances of the present case involving a non-negligent diagnosis of Bell's palsy, we conclude that the circuit court could not determine, as a matter of law, that the physician had no duty to inform the patient of the possibility that the cause of his symptoms might be a blocked artery, which posed imminent, life-threatening risks, and of the availability of alternative, non-invasive means of ruling out or confirming the source of his symptoms.

¶ 11. PIC raises a fundamental legal question concerning the scope of a physician's duty to inform a patient. We begin by recognizing that the instant case, like many cases this court decides, presents complicated

---

[6] *Kuklinski v. Rodriguez,* 203 Wis. 2d 324, 329, 552 N.W.2d 869 (Ct. App. 1996) (quoting *Martin v. Richards,* 192 Wis. 2d 156, 175, 531 N.W.2d 70 (1995)). *See also Bubb v. Brusky,* 2009 WI 91, ¶ 62, 321 Wis. 2d 1, 768 N.W.2d 903.

[7] *Johnson v. Kokemoor,* 199 Wis. 2d 615, 639, 545 N.W.2d 495 (1996).

[8] *Bubb,* 321 Wis. 2d 1, ¶ 54 (citing *Scaria,* 68 Wis. 2d at 11, 12–13).

[9] *Id.* (citing *Scaria,* 68 Wis. 2d at 11, 12–13).

questions about how a legal doctrine, here the reasonable patient standard in informed consent cases, unfolds in real life situations.

I

¶ 12. The practice of medicine is complex. Circumstances differ from case to case. Patients often lack the expertise of their physicians, and patients can become overwhelmed and confused by medical information. Nonetheless, the court and the legislature have embraced the notion that although the physician is the expert, the patient should have the opportunity to understand what is happening to his or her body and autonomously and intelligently consent or refuse to consent to proposed medical care.[10] Informed consent is fundamentally about each person's right to decide "what shall be done with his [or her] own body."[11]

¶ 13. Creating informed consent requirements that allow physicians to confidently perform their all-important work without fearing unfair and unpredictable liability, and that give patients a meaningful op-

---

[10] *See, e.g., Hannemann v. Boyson,* 2005 WI 94, ¶ 34, 282 Wis. 2d 664, 698 N.W.2d 714 (noting that the duty of informed consent is "premised on the notion that 'a person of sound mind has a right to determine, even as against his physician, what is to be done to his body'" (quoting *Trogun v. Fruchtman,* 58 Wis. 2d 569, 596, 207 N.W.2d 297 (1973))). *See generally* Dr. Nili Karako-Eyal, *Physicians' Duty of Disclosure: A Deontological and Consequential Analysis,* 14 Quinnipiac Health L.J. 1, 6–9 (2010) (discussing the benefits and importance of patient autonomy).

[11] *Martin,* 192 Wis. 2d at 169 (quoted source omitted).

portunity to intelligently exercise their right of self-determination, is the challenge. A careful balance must be struck and clearly communicated to the concerned communities.[12]

¶ 14. The court and the legislature have made this balance by adopting the reasonable patient approach to informed consent.

A

■

¶ 15. The formulation of the reasonable patient approach is stated in a variety of consistent ways in the case law. The objective, negligence-based approach inherently limits the scope of the physician's duty to inform the patient. A "physician's duty to inform is not boundless."[13]

■

¶ 16. The physician's duty to inform does not mean the physician is "required to know every potential risk but only those known to a reasonably well qualified practitioner or specialist commensurate with his [or her] classification in the medical profession."[14] Notably for the present case, in 2009 this court refused to accept

---

[12] *See generally* Mark A. Hall, *A Theory of Economic Informed Consent*, 31 Ga. L. Rev. 511, 545–56 (1997) (discussing the need to balance patient autonomy with the need to contain the costs of healthcare and to keep disclosures within limits manageable by both patients and physicians).

[13] *Bubb*, 321 Wis. 2d 1, ¶ 54 (citing *Scaria*, 68 Wis. 2d at 11, 12–13).

[14] *Scaria*, 68 Wis. 2d at 11, *quoted with approval in Bubb*, 321 Wis. 2d 1, ¶ 54.

the argument that the reasonable patient standard would unduly burden emergency room physicians.[15]

¶ 17. The physician must disclose only "what is material to the patient's decision, *i.e.,* all of the viable alternatives and risks of the treatment proposed."[16] This means that "Wisconsin law 'requires that a physician disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis.' "[17] There is a "duty imposed on the physician to disclose to the patient the existence of any methods of diagnosis or treatment that would serve as feasible alternatives to the method initially selected by the physician to diagnose or treat the patient's illness or injury."[18]

¶ 18. The court has observed that "[w]hat constitutes informed consent in a given case emanates from what a reasonable person in the patient's position would want to know."[19] The court has rejected a proposed bright-line rule that would require physicians "to disclose only significant complications intrinsic to the

---

[15] The court determined that the express limitations in Wis. Stat. § 448.30 protected against emergency room physicians being held to an unrealistic standard given the nature of their work. *Bubb,* 321 Wis. 2d 1, ¶¶ 75–76.

[16] *Martin,* 192 Wis. 2d at 174, *quoted with approval in Bubb,* 321 Wis. 2d 1, ¶ 62.

[17] *Kuklinski,* 203 Wis. 2d at 329 (quoting *Martin,* 192 Wis. 2d at 175).

[18] *Martin,* 192 Wis. 2d at 176 (quoting John H. Derrick, Annotation, *Medical Malpractice: Liability for Failure of Physician to Inform Patient of Alternative Modes of Diagnosis or Treatment,* 38 A.L.R. 4th 900, 903 (1985)).

[19] *Johnson,* 199 Wis. 2d at 632.

contemplated procedure."[20] The court has observed that "[t]he prudent patient standard adopted by Wisconsin in *Scaria* is incompatible with such a bright line rule."[21]

¶ 19. The requirement of disclosure "is rooted in the facts and circumstances of the particular case in which it arises."[22] "The information that is reasonably necessary for a patient to make an informed decision regarding treatment will vary from case to case."[23]

¶ 20. The physician is "to make such disclosures as appear *reasonably* necessary under circumstances then existing to enable a *reasonable* person *under the same or similar circumstances confronting the patient at the time of disclosure* to intelligently exercise his right to consent or to refuse the treatment or procedure proposed."[24]

¶ 21. Even if it is determined that the information withheld is information "a reasonable person under the circumstances would want to know," the physician has no duty to inform the patient unless the physician "had sufficient knowledge about the patient's condition to trigger the physician's awareness that the information was reasonably necessary for the patient . . . to make an

---

[20] *Id.* at 637–38.

[21] *Id.* at 639.

[22] *Id.*

[23] *Martin,* 192 Wis. 2d at 175, *quoted with approval in Johnson,* 199 Wis. 2d at 634.

[24] *Scaria,* 68 Wis. 2d at 13 (emphasis added), *quoted with approval in Bubb,* 321 Wis. 2d 1, ¶ 53.

intelligent decision regarding the patient's care, or should have had that knowledge."[25]

¶ 22. Thus, physicians are not held liable for failing to disclose information if they could not reasonably have known, based on circumstances then existing, that the information was potentially important. The focus of an evaluation of whether a physician is negligent for failing to disclose available methods of diagnosis or treatment is on the circumstances existing when the information allegedly should have been given, not on circumstances arising thereafter.[26]

¶ 23. In addition to these important limiting principles that are inherent in the objective, negligence-based reasonable patient standard, the court in *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 12–13, 227 N.W.2d 647 (1975), created several express limitations, which were adopted by the legislature and included in Wis. Stat. § 448.30. The court in *Bubb v. Brusky*, 2009 WI 91, 321 Wis. 2d 1, 768 N.W.2d 903, later relied on these express limitations to assuage the concern that emergency room physicians were being held to an unattainable standard.[27]

¶ 24. The *Scaria* court listed limitations to a physician's duty of disclosure as follows:

> A doctor should not be required to give a detailed technical medical explanation that in all probability the patient would not understand. He should not be required to discuss risks that are apparent or known to the patient. Nor should he be required to disclose extremely remote possibilities that at least in some

---

[25] *Kuklinski,* 203 Wis. 2d at 330.

[26] *Id.* at 331.

[27] *Bubb,* 321 Wis. 2d 1, ¶¶ 75–77.

instances might only serve to falsely or detrimentally alarm the particular patient. Likewise, a doctor's duty to inform is further limited in cases of emergency or where the patient is a child, mentally incompetent or a person is emotionally distraught or susceptible to unreasonable fears.[28]

¶ 25. Wisconsin Stat. § 448.30 lists the following limitations on liability:

The physician's duty to inform the patient under this section does not require disclosure of:

(1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.

(2) Detailed technical information that in all probability a patient would not understand.

(3) Risks apparent or known to the patient.

(4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.

(5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

(6) Information in cases where the patient is incapable of consenting.

¶ 26. It is clear that the objective, negligence-based approach and Wis. Stat. § 448.30 limit the scope of the physician's duty to inform the patient. The physician's duty to inform is not boundless.

_____

[28] *Scaria,* 68 Wis. 2d at 12–13, *quoted with approval in Bubb,* 321 Wis. 2d 1, ¶ 54.

¶ 27. The liability imposed on Dr. Bullis and on other physicians in similar situations, springing from an objective, negligence-based reasonable patient standard, is decidedly not strict liability. Physicians are liable only if the information they fail to disclose is *"reasonably* necessary for a *reasonable* person to make an intelligent decision with respect to the choices of treatment or diagnosis."[29]

¶ 28. The argument that the rationale in the present case upholding the jury verdict against Dr. Bullis renders "physicians essentially strictly liable for bad results even though they were not negligent in the care and treatment of their patients"[30] is unfounded. It displays a misunderstanding of the reasonable patient standard.

¶ 29. A more subtle point, however, is that this strict liability argument rests on a mistrust of juries. Because duty to inform cases ordinarily arise when a bad medical result has occurred, the fear is that juries will be influenced by "hindsight bias." "Hindsight bias" is a well-documented phenomenon that causes people to overestimate, after the fact, how likely it was that an event would occur simply because the event did, in fact, occur.[31]

¶ 30. Our system of law relies on juries to adhere faithfully to instructions on the law and to set aside any

---

[29] *Martin,* 192 Wis. 2d at 174 (emphasis added).

[30] *Jandre,* 330 Wis. 2d 50, ¶ 44 (Fine, J., concurring).

[31] *See, e.g.,* Robert P. Agans & Leigh S. Shaffer, *The Hindsight Bias: The Role of the Availability Heuristic and Perceived Risk,* 15 Basic & Applied Soc. Psych. 439 (1994).

biases and sympathies. If we cannot trust juries in the context of informed consent cases, we call into question the integrity of the jury system in all cases.

¶ 31. One of the cases PIC relies on heavily actually presents a good example of a jury's faithfully applying the objective, negligence-based standard and finding that a physician was not liable for breach of the duty to inform, despite the fact that the patient suffered a medical catastrophe. In *Kuklinski v. Rodriguez,* 203 Wis. 2d 324, 552 N.W.2d 869 (Ct. App. 1996), the jury found that based on what the physician knew about the patient's condition at the time the patient contended disclosure should have been made, the physician was not negligent in failing to provide information to the patient.[32]

¶ 32. Although, in hindsight, it was clear that severe harm to the patient might have been prevented had the physician informed the patient about the possibility of using a CT scan as a diagnostic tool, the jury understood that it was its duty to determine the physician's negligence on the basis of what the physician knew at the time the information allegedly should have been given, not what the physician came to know later.

¶ 33. Based on the limitations that are inherent in the objective, negligence-based reasonable patient standard, the limitations that are expressly included in Wis. Stat. § 448.30, and our belief that juries are capable of faithfully applying the reasonable patient standard, we conclude that the reasonable patient standard imposed on physicians in cases like the instant one is not "essentially strict liability."

---

[32] *Kuklinski,* 203 Wis. 2d at 334.

## C

¶ 34. The doctrine of *stare decisis* governs the present case. Both the majority opinion and the concurrence in the court of appeals' decision conclude, as do we, that the circuit court's judgment was based on "well-established precedent in Wisconsin."[33]

¶ 35. As Judge Fine stated in his concurring opinion: "As seen from the [majority opinion's] cogent analysis of existing law in connection with the informed-consent issue, its conclusion that we must affirm is compelled by precedent."[34] As we shall explain further, the present case is consistent with well-established precedent, including *Martin v. Richards*, 192 Wis. 2d 156, 531 N.W.2d 70 (1995), *Kuklinski v. Rodriguez*, 203 Wis. 2d 324, 552 N.W.2d 869 (Ct. App. 1996), and the court's recent decision in *Bubb*. Furthermore, the facts of the present case are substantially similar to those in *Martin* and *Bubb*.[35]

---

[33] *Jandre*, 330 Wis. 2d 50, ¶¶ 3, 44 (Fine, J., concurring).

[34] *Id.*, ¶ 44 (Fine, J., concurring).

[35] The *Martin* case, the *Bubb* case, and the present case have the following factual similarities:

(1) In all three cases, the treating physician was an emergency medicine physician.

(2) In all three cases, the patient eventually suffered severe harm from an ailment or disease other than that which the physician included in the final diagnosis.

(3) In all three cases, the physician failed to inform the patient of alternative diagnostic tools that could have been used to determine the cause of the ailment.

(4) In all three cases, the patient's medical malpractice claim of negligent care and diagnosis was unsuccessful.

(5) In all three cases, the supreme court concluded that a viable claim of breach of the physician's duty of informed consent was for the jury's determination.

¶ 36. Fidelity to precedent is a fundamental concept in American law. Under the doctrine of *stare decisis*, a court will adhere to a principle of law adopted after argument as binding precedent where the very point is again in controversy. When existing law is open to recurring revision, the task of deciding cases becomes an exercise of judicial will, with arbitrary and unpredictable results.[36] This court follows the doctrine of *stare decisis* because of our respect for the rule of law.[37] Departure from prior case precedent without good reason undermines confidence in the reliability of court decisions.

¶ 37. Overruling prior case law requires a compelling justification.[38] No such compelling justification exists in the present case. The legislature has not changed Wis. Stat. § 448.30 since its enactment. The policy considerations raised by PIC in the present case to undermine precedent are substantially similar to those argued and rejected in prior cases. Prior case law is sound as applied to the present case. *Stare decisis* compels us to reject PIC's interpretation of Wis. Stat. § 448.30, to adhere to prior case law, and to affirm the decision of the court of appeals that affirms the jury verdict.

[36] *Schultz v. Natwick,* 2002 WI 125, ¶ 37, 257 Wis. 2d 19, 653 N.W.2d 266.

[37] *Johnson Controls v. Employers Ins. of Wausau,* 2003 WI 108, ¶ 95, 264 Wis. 2d 60, 665 N.W.2d 257.

[38] *State v. Outagamie County Bd. of Adjustment,* 2001 WI 78, ¶ 71, 244 Wis. 2d 613, 628 N.W.2d 376 (Crooks, J., concurring); *State v. Stevens,* 181 Wis. 2d 410, 442, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring).

¶ 38. Applying the reasonable patient standard, we conclude that under the circumstances of the present case Dr. Bullis had a duty to inform Jandre on the night of June 13, 2003, of the availability of an alternative, viable means of determining whether he had suffered an ischemic stroke event rather than an attack of Bell's palsy. Dr. Bullis failed to discharge this duty, even though she knew that Bell's palsy was a diagnosis of exclusion (that is, there is no affirmative test for Bell's palsy) and that her chosen method of excluding an ischemic stroke event was, to quote Dr. Bullis, "very, very poor." A jury could have determined under the facts and circumstances of the present case that Dr. Bullis should have known that information about another available non-invasive diagnostic tool was information a reasonable patient in Jandre's position would have wanted in order to decide intelligently whether to follow Dr. Bullis's recommendations.

II

¶ 39. The relevant facts are not in dispute for purposes of our review. On June 13, 2003, the coffee Jandre was drinking began coming out of his nose, and he began drooling and slurring his speech. The left side of his face drooped. He experienced about 20 minutes of dizziness and weakness in his legs.

¶ 40. Jandre's co-workers took him to the emergency room, and the ER nurse noted these symptoms on Jandre's chart.

¶ 41. Jandre was evaluated at the emergency room by Dr. Bullis, who read Jandre's chart, took Jandre's medical, social, and family history, and performed a physical examination. Dr. Bullis testified that

her differential diagnosis included "Bell's Palsy, stroke, TIA, all of those stroke syndromes including ischemic as well as hemorrhagic, tumors, syndromes like— things like Guillain-Barre, MS [multiple sclerosis], and multiple other things like that." She noted that it included "some of the more obscure disease processes."

¶ 42. There are two types of strokes: hemorrhagic and ischemic. Either type can cause death or permanent injury.

¶ 43. Hemorrhagic strokes involve bleeding in the brain tissue. After arriving at her differential diagnosis, Dr. Bullis ordered a CT scan, which could rule out a hemorrhagic stroke and brain tumors. The results were normal. A CT scan will not detect an ischemic stroke.

¶ 44. Ischemic strokes are commonly caused by a blockage in the carotid artery in the neck that cuts off the brain's blood supply. "Ischemic stroke event" is used here to refer to both a full-blown ischemic stroke and the less serious conditions called a "temporary ischemic attack" (TIA) and a "reversible ischemic neurological deficit" (RIND). TIA and RIND are two types of "mini-strokes," which are warning signs of a full-blown stroke, but usually do not cause long-term damage.

¶ 45. To determine whether Jandre had suffered an ischemic stroke event, Dr. Bullis listened to Jandre's carotid arteries with a stethoscope in an effort to detect the "whooshing sound" characteristic of turbulent blood flow caused by a blocked artery, known as a "bruit." Dr. Bullis admitted at trial that listening to the carotid arteries for a bruit is a "very, very poor screening test for determining what shape the arteries are in." Her testimony established that a bruit will not be heard if an artery is severely blocked and it will also not be heard if the artery is clear.

¶ 46. Dr. Bullis had the option of ordering a carotid ultrasound to assess the state of Jandre's carotid arteries, but she chose not to. A carotid ultrasound is a non-invasive diagnostic technique that was available at the hospital and is more reliable than listening with a stethoscope for bruits.

¶ 47. Also pertinent here is testimony that Jandre's symptoms were atypical of Bell's palsy. Witnesses testified that Bell's palsy is a viral inflammation of the seventh cranial nerve, which enervates the face only. Thus, in a classic case of Bell's palsy, the symptoms involve only facial paralysis. Jandre's additional symptoms of trouble swallowing (a process controlled by different nerves), dizziness, and weakness of the legs were all atypical of Bell's palsy. Bell's palsy typically comes on slowly over a course of a few days; Jandre's symptoms came on quickly.

¶ 48. Jandre's symptoms of slurred speech, dizziness, and weakness in the legs are associated with an ischemic stroke event.

¶ 49. On the basis of the symptoms and the tests performed, Dr. Bullis ruled out an ischemic stroke event and came to a final diagnosis of a mild form of Bell's palsy. Notably, Bell's palsy is a "diagnosis of exclusion," which means there is no affirmative test for Bell's palsy. The only way to diagnose Bell's palsy is to rule out all other potential conditions.

¶ 50. Dr. Bullis informed Jandre that she believed that he had Bell's palsy, prescribed medication, and sent him home with instructions to see a neurologist for follow-up care.

¶ 51. Dr. Bullis did not tell Jandre the following: (1) that he had an atypical presentation of Bell's palsy; (2) that his symptoms were also consistent with an ischemic stroke event; (3) that her method of eliminat-

ing an ischemic stroke event from the differential diagnosis was "very poor"; (4) that she could have ordered a carotid ultrasound to definitively rule out the possibility of an ischemic stroke event; and (5) that an event such as a TIA or a RIND is often a harbinger of a full-blown ischemic stroke.

¶ 52. At trial, Dr. Bullis testified that she did not think she needed to tell Jandre about TIA or RIND because she considered both very unlikely and remote possibilities.

¶ 53. Three days after seeing Dr. Bullis in the emergency room, Jandre saw a family medicine physician who noted that Jandre exhibited signs of resolving Bell's palsy.

¶ 54. On the evening of June 24, 2003, Jandre suffered a full-blown stroke, which impaired his physical and cognitive abilities. A carotid ultrasound performed at the hospital revealed that his right internal carotid artery was 95 percent blocked. Two expert witnesses at trial testified that they would have ordered a carotid ultrasound for Jandre on June 13, 2003; that Jandre had experienced a TIA or RIND on that day; that a carotid ultrasound would have revealed the blockage in Jandre's carotid artery; and that surgery could have been performed, reducing the likelihood that Jandre would suffer a stroke.

¶ 55. With regard to Jandre's claim of negligent misdiagnosis, one form of medical malpractice, the jury was given pattern jury instructions, Wis JI—Civil 1023, about the "reasonable doctor" standard of care. The jury was told that the standard of negligence is whether Dr. Bullis "failed to use the degree of care, skill, and judgment which reasonable emergency room physicians would exercise given the state of medical knowledge on June 13, 2003." Because there was evidence of two or

more alternative methods of treatment or diagnosis recognized as reasonable, the jury was further instructed that Dr. Bullis was not negligent in diagnosing Bell's palsy if she chose one recognized diagnostic method rather than another and used reasonable care, skill, and judgment in administering the method.[39]

¶ 56. Given the conflicting testimony by experts relating to the appropriate diagnosis and treatment, the jury could have reasonably concluded, and did conclude, that Dr. Bullis's diagnosis and treatment were reasonable under the circumstances. The Jandres do not seek review of the jury's verdict against them on their claim of negligent misdiagnosis.

¶ 57. The standard governing informed consent, in contrast to the standard governing negligent misdiagnosis, is the reasonable patient standard. Thus, the jury was instructed that a doctor must provide the patient with the information a reasonable person in the patient's position would regard as significant when deciding to accept or reject a diagnostic procedure. The jury was also instructed that the physician's duty to inform does not require disclosure of "extremely remote possibilities that might falsely or detrimentally alarm the patient."[40]

---

[39] The relevant part of the instruction is as follows:

If you find from the evidence that more than one method of diagnosing . . . Thomas Jandre's condition was recognized as reasonable given the state of medical knowledge at that time, then Dr. Therese Bullis was at liberty to select any of the recognized methods. Dr. Therese Bullis was not negligent because she chose to use one of these recognized diagnostic methods rather than another . . . recognized method if she used reasonable care, skill, and judgment in administering the method.

[40] In *Martin*, 192 Wis. 2d at 168, the court concluded as a matter of law that in light of the serious consequences of an

¶ 58. The jury was asked to answer the following (pattern) special verdict questions:

intracranial bleed, a one to three percent chance is not remote: "[A]lthough the risk of complication may be small, such risk may be significant to a patient's decision in light of the potentially severe consequences" (citations omitted).

The full jury instruction relating to question 3 is as follows:

Question Number 3 on the verdict form asks: Did Dr. Therese Bullis fail to disclose information about the alternative methods of diagnosis necessary for Thomas Jandre to make an informed decision?

A doctor has the duty to provide her patient with information necessary to enable the patient to make an informed decision about a diagnostic procedure and alternative choices of diagnostic procedures. If the doctor fails to perform this duty, she is negligent.

To meet this duty to inform her patient, a doctor must provide her patient with the information a reasonable person in the patient's position would regard as significant when deciding to accept or reject a diagnostic procedure. In answering this question, you should determine what a reasonable person in the patient's position would want to know in consenting to or rejecting a diagnostic procedure.

The doctor must inform the patient whether a diagnostic procedure is ordinarily performed in the circumstances confronting the patient, whether alternate procedures approved by the medical profession are available, what the outlook is for success or failure of each alternate procedure, and the benefits and risks inherent in each alternate procedure.

However, the physician's duty to inform does not require disclosure of:

Information beyond what a reasonably well-informed physician in a similar medical classification would know;

Detailed technical information that in all probability the patient would not understand;

The risks apparent or known to the patient;

Extreme remote possibilities that might falsely or detrimentally alarm the patient.

*Question No. 3:* Did defendant Dr. Therese J. Bullis fail to disclose to Thomas Jandre information about alternative medical diagnoses or treatments, which were [sic] necessary for Thomas Jandre to make an informed decision?

The jury answered Yes.

*Question No. 4:* If you answered question 3 "yes," then answer this question: If a reasonable person, placed in Thomas Jandre's position, had been provided necessary information about alternative medical diagnoses or treatments would that person have undertaken the alternative medical diagnoses or treatment?

The jury answered Yes.

*Question No. 5:* If you have answered both questions 3 and 4 "yes," then answer this question: Was the failure by Dr. Therese Bullis to disclose information about alternative medical diagnoses or treatment a cause of Thomas Jandre's injuries?[41]

The jury answered Yes.

¶ 59. The jury awarded the Jandres damages of approximately $2,000,000.[42]

---

If Dr. Therese Bullis offers you an explanation to why she did not provide information to Thomas Jandre, and if this explanation satisfies you that a reasonable person in Thomas Jandre's position would not have wanted to know that information, then Dr. Therese Bullis was not negligent.

[41] The language of these special verdict questions closely tracks that found in Wis JI—Civil 1023.1.

[42] Before the court of appeals heard the case, PIC moved to consolidate it with *Bubb* on the belief that the cases "rais[ed] the same central issue." *Jandre,* 330 Wis. 2d 50, ¶ 16. The court of appeals instead stayed the present case until this court decided *Bubb,* and PIC now tries to distinguish this case from *Bubb.*

65

## III

¶ 60. This case involves the interpretation and application of Wisconsin's informed consent statute, Wis. Stat. § 448.30. Interpreting and applying a statute to facts presents a question of law, which this court determines independently of the circuit court and court of appeals but benefiting from their analyses.[43]

¶ 61. This case also requires us to determine the applicability of prior cases, particularly *Scaria*, 68 Wis. 2d 1, *Martin*, 192 Wis. 2d 156, and *Bubb*, 321 Wis. 2d 1, to the facts in the instant case. The interpretation and application of prior case law to a new set of facts presents another question of law, which this court decides independently of the circuit court and court of appeals but benefiting from their analyses.[44]

## IV

¶ 62. PIC urges the court to hold that when a physician is not negligent in his or her final diagnosis and fully explains to the patient the risks and benefits of treatment alternatives for the condition diagnosed (here, Bell's palsy), the physician has no further obligation to disclose tests or treatments pertaining to other conditions that were included in the physician's differential diagnosis. In other words, PIC wants this court to adopt a bright-line rule that a physician has no duty to

---

[43] *Marder v. Bd. of Regents of the Univ. of Wis. Sys.*, 2005 WI 159, ¶ 19, 286 Wis. 2d 252, 706 N.W.2d 110 (citing *State v. Cole*, 2003 WI 59, ¶ 12, 262 Wis. 2d 167, 663 N.W.2d 700).

[44] *Acuity Mut. Ins. Co. v. Olivas*, 2007 WI 12, ¶ 25, 298 Wis. 2d 640, 726 N.W.2d 258.

inform a patient of alternative tests and treatments for conditions unrelated to the condition diagnosed.

¶ 63. According to PIC's bright-line rule, Dr. Bullis had no duty to inform Jandre of the available alternative diagnostic tool to rule out a stroke, because a stroke is unrelated to Bell's palsy. Although the two conditions, stroke and Bell's palsy, have overlapping but not identical symptoms, PIC contends that the two are unrelated because a diagnosis of Bell's palsy does not carry with it an increased risk of stroke.

¶ 64. PIC asserts that the circuit court and court of appeals have expanded a physician's duty to inform beyond the statute and case law and that this court should adopt PIC's bright-line rule and hold as a matter of law, on the basis of this record, that the circuit court should have dismissed the informed consent claim without submitting it to the jury.

¶ 65. It is well established, as we have stated previously, that a physician's duty to disclose information is governed by the informational needs of a reasonable patient. Grounding this general articulation of the legal standard in the facts of the present case, the jury must determine whether upon hearing Dr. Bullis's diagnosis of Bell's palsy (a diagnosis that can be reached only by eliminating all other possibilities), Jandre could reasonably have wanted to know that a carotid ultrasound was available as a diagnostic tool for ischemic stroke and that it could more accurately eliminate the possibility of ischemic stroke than the physical examination Dr. Bullis performed.

¶ 66. PIC asserts that under Wis. Stat. § 448.30 and the case law, a bright-line rule exists that a reasonable patient would never need to be informed about

conditions that are unrelated to a non-negligent final diagnosis in order to make an intelligent, informed decision regarding medical care.

¶ 67. PIC makes numerous arguments to support its interpretation of a physician's duty of informed consent. We shall discuss each of the following arguments raised by PIC in turn:

A. The "plain language" of Wis. Stat. § 448.30 and the *Scaria* decision refer only to treatment, not diagnosis, and even if diagnostic techniques are within the scope of the duty to inform, the duty does not extend to alternative diagnostic tools for conditions unrelated to the condition diagnosed.

B. The jury's verdict on Jandre's informed consent claim was inconsistent with its verdict of non-negligent diagnosis.

C. Under *Martin v. Richards,* the physician does not have a duty to inform the patient about conditions unrelated to the condition diagnosed.

D. Under *Bubb v. Brusky,* the physician does not have a duty to inform the patient about conditions unrelated to the condition diagnosed.

E. *Kuklinski v. Rodriguez* holds that a physician's duty to inform does not attach until the physician reaches a final diagnosis.

F. Failing to adopt PIC's view of the law of informed consent makes bad law and contravenes sound public policy.

¶ 68. We do not agree with PIC that its position is supported by *Scaria,* or Wis. Stat. § 448.30, or any other cases. In order to adhere to the reasonable patient standard and principles of *stare decisis,* we reject the

68

bright-line rule PIC proposes. No compelling reason has been set forth to overturn precedent.

A

(1) The *Scaria* Decision

¶ 69. PIC argues that the "plain language" of Wis. Stat. § 448.30 and the *Scaria* decision refer only to treatment, not diagnosis, and that even if diagnostic techniques are within the scope of a physician's duty to inform, the duty does not extend to alternative diagnostic tools for conditions unrelated to the condition diagnosed. Under PIC's interpretation of the law of informed consent, Dr. Bullis had no duty to inform Jandre about the carotid ultrasound diagnostic tool because it relates to an ischemic stroke event, which is unrelated to Dr. Bullis's non-negligent, final diagnosis of Bell's palsy.

¶ 70. In *Scaria,* 68 Wis. 2d 1, the physician failed to disclose risks associated with an aortogram, which is a diagnostic procedure the physician asked the patient to undergo to determine the cause of high blood pressure. After suffering severe harm from the procedure, the patient filed claims for both negligent care and treatment and breach of the duty to inform.[45]

¶ 71. The issue before the court in *Scaria* involved the patient's challenge to the jury instruction adopting the "reasonable *physician*" approach to informed consent.

¶ 72. Under the reasonable *physician* approach, the scope of the physician's duty to inform is determined solely and exclusively by the generally accepted

---

[45] *Scaria,* 68 Wis. 2d at 20.

customs of the medical profession. The trial court in *Scaria* gave the following jury instruction reciting the reasonable physician standard:

[Y]ou are instructed that a physician and surgeon has a duty to make reasonable disclosure to his patient of all significant facts under the circumstances of the situation which are necessary to form the basis of an intelligent and informed consent by the patient to the proposed treatment or operation and the patient must have given such consent to the treatment or operation. This duty, however, is limited to those disclosures which physicians and surgeons of good standing would make under the same or similar circumstances, having due regard to the patient's physical, mental and emotional condition.[46]

¶ 73. In *Scaria,* the supreme court took issue with the emphasized portion of the instructions, stating that "[t]he right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure" and "[t]he need of a particular patient . . . should not necessarily be limited to a self-created custom of the profession."[47]

¶ 74. In place of the reasonable *physician* approach to informed consent, the *Scaria* court relied considerably on its rationale in an earlier case, *Trogun v. Fruchtman,* 58 Wis. 2d 569, 207 N.W.2d 297 (1973), which in turn had relied considerably on *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972), for its articulation of what has come to be known as the "reasonable patient" (or the "prudent patient") standard in informed consent cases.[48]

---

[46] *Id.* at 10 (emphasis added).

[47] *Id.* at 12.

[48] *Id.* at 13.

¶ 75. The *Bubb* court noted that *Trogun* endorsed the standard set forth in *Canterbury,* which stated that "for a physician to fully satisfy the standard of due care, she must inform the patient of any risks to his well-being which contemplated therapy may involve."[49] The *Trogun* case (which *Bubb* recently endorsed) declared that disclosure was "to be judged by that conduct which is reasonable under the circumstances. . . . [T]he scope of the physician's disclosure *must be measured by the patient's 'objective' need for information material to his decision . . . .*"[50]

¶ 76. In *Scaria,* the court adopted a refined articulation of the reasonable patient standard, holding:

> In short, the duty of the doctor is to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed.[51]

¶ 77. This standard has since been reaffirmed on many occasions.[52]

¶ 78. Neither the facts nor the law in *Scaria* supports PIC's position.

---

[49] *Bubb,* 321 Wis. 2d 1, ¶ 50 (internal quotation marks omitted).

[50] *Trogun,* 58 Wis. 2d at 600–01 (citing *Canterbury,* 464 F.2d at 785, 787), *quoted with emphasis added in Bubb,* 321 Wis. 2d 1, ¶ 51. *Bubb* also quoted *Cobbs v. Grant,* 502 P.2d 1, 11 (Cal. 1972) ("[T]he patient's right of self-decision is the measure of the physician's duty to reveal.")

[51] *Scaria,* 68 Wis. 2d at 13.

[52] *See, e.g., Bubb,* 321 Wis. 2d 1; *Johnson,* 199 Wis. 2d 615; *Martin,* 192 Wis. 2d 156.

¶ 79. We turn our attention from *Scaria* to Wis. Stat. § 448.30, which was enacted in 1982 to "codif[y] the common law set forth in *Scaria.*"[53]

(2) Wis. Stat. § 448.30

¶ 80. The statute contains a general articulation of the scope of the duty of disclosure and provides six express limitations on a physician's duty of disclosure. The statute reads as follows:

> Information on alternate modes of treatment. Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physicians duty to inform the patient under this section does not require disclosure of:
>
> (1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
>
> (2) Detailed technical information that in all probability a patient would not understand.
>
> (3) Risks apparent or known to the patient.
>
> (4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.

---

[53] *Johnson,* 199 Wis. 2d at 629–30, *quoted with emphasis in Bubb,* 321 Wis. 2d 1, ¶ 57. For other cases declaring that the statute was enacted to codify the common law standards for informed consent set forth in *Scaria,* see *Hannemann,* 282 Wis. 2d 664, ¶ 48; *Martin,* 192 Wis. 2d at 174.

The Legislative Reference Bureau Note to 1981 A.B. 941, which became Wis. Stat. § 448.30, states: "The bill places in the statutes the standard of care that physicians are required to meet under *Scaria.*" *Martin,* 192 Wis. 2d at 174.

(5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

(6) Information in cases where the patient is incapable of consenting.

¶ 81. PIC argues that the plain words of the statute—"medical modes of treatment" and "benefits and risks of these treatments"—and the language from *Scaria*—"consent to a proposed treatment or procedure" —necessarily mean that a physician's duty to inform the patient does not attach to a physician's diagnostic process but attaches only after a final diagnosis is made. We rebuff PIC's narrow reading of the statute and *Scaria,* just as we have in prior cases.

¶ 82. The court has "rejected the argument that Wis. Stat. § 448.30 was limited by its plain language to disclosures intrinsic to a proposed treatment regimen."[54] As we have explained, Wis. Stat. § 448.30 codified the reasonable patient approach from *Scaria,* so under the statute the scope of a physician's duty to inform "is driven" by "*what is reasonably necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis.*"[55] The court has declared that it is the patient's "*condition* [symptoms], *not the diagnosis, that drives the duty to* inform" in a case.[56]

---

[54] *Johnson v. Kokemoor,* 199 Wis. 2d 615, 640, 545 N.W.2d 495 (1996).

[55] *Martin,* 192 Wis. 2d at 174, *quoted with approval and emphasis in Bubb,* 321 Wis. 2d 1, ¶ 62.

[56] *Martin,* 192 Wis. 2d at 180–81, *quoted with approval and emphasis in Bubb,* 321 Wis. 2d 1, ¶ 65.

### (3) Subsequent Case Law

¶ 83. The *Martin* court addressed the issue of diagnoses directly. The court considered the statute's legislative history and adopted the following "reasonable person" interpretation of the statute and the *Scaria* case to include diagnosis:

> There can be no dispute that the language in *Scaria*, 68 Wis. 2d at 13, 227 N.W.2d 647, requires that a physician disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis. Because this standard was adopted by the legislature, as indicated by the LRB notes, the phrase "modes of treatment" in sec. 448.30, Stats., should not be construed so as to unduly limit the physician's duty to provide information which is reasonably necessary under the circumstances. Such a reading would be contrary to *Scaria*. Certainly, procedures which are purely diagnostic in nature are not excluded from sec. 448.30's reach. In *Scaria*, itself, the plaintiff's injuries resulted from complications associated with an aortogram, a diagnostic procedure. *Id.* at 4, 227 N.W.2d 647. *The distinction between diagnostic and medical treatments is not in and of itself significant to an analysis of informed consent.*[57]

¶ 84. As support for this position, the *Martin* court relied on the following language from an ALR annotation:

> [I]t may safely be stated that, as part of the physician's duty to obtain a patient's informed consent to any medical procedure employed by the physician in dealing with the patient, there is a duty imposed on the physician to disclose to the patient the existence of any

---

[57] *Martin,* 192 Wis. 2d at 175–76 (second emphasis added) (internal quotation marks omitted).

methods of diagnosis or treatment that would serve as feasible alternatives to the method initially selected by the physician to diagnose or treat the patient's illness or injury.[58]

¶ 85. Moreover, the *Martin* court declined to adopt the Seventh Circuit Court of Appeals' narrow interpretation of Wis. Stat. § 448.30.[59] The federal court limited the doctrine of informed consent to apprising the patient of the risks that inhere in a proposed treatment and did not impose a duty to inform a patient of alternative, viable methods of diagnosis.[60]

¶ 86. So too did the *Bubb* court directly address the issue of diagnoses under Wis. Stat. § 448.30. The unanimous *Bubb* court[61] concluded: "Wis. Stat. § 448.30 requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, *including diagnosis,* as well as the benefits and risks of such treatments."[62]

¶ 87. Interpreting Wis. Stat. § 448.30 and *Scaria* to require disclosure about diagnostic techniques under certain facts and circumstances is sensible because diagnosis is an essential component of modes of treatment, and diagnostic tests are important to a patient's

---

[58] John H. Derrick, Annotation, *Medical Malpractice: Liability For Failure of Physician to Inform Patient of Alternative Modes of Diagnosis or Treatment,* 38 A.L.R. 4th 900, 903 (1985).

[59] *Martin,* 192 Wis. 2d at 176.

[60] *McGeshick v. Choucair,* 9 F.3d 1229, 1233–35 (7th Cir. 1993).

[61] Justice Ziegler did not participate.

[62] *Bubb,* 321 Wis. 2d 1, ¶ 78 (emphasis added).

75

decision making. In fact, *Scaria* itself involved disclosures regarding a diagnostic procedure, not treatment narrowly defined.

¶ 88. In sum, neither Wis. Stat. § 448.30 nor the *Scaria* case (and subsequent case law) limits the physician's duty to inform the patient to modes of treatment only for the final diagnosis.

¶ 89. We further conclude that the distinction between conditions "related" to the final diagnosis and conditions "unrelated" to the final diagnosis finds no support in the statute or case law. PIC is correct that neither the statute nor *Scaria* expressly states that the duty to inform extends to conditions unrelated to the final diagnosis. The reason for this silence is that the statute and *Scaria* present an objective, negligence-based reasonable patient standard. It is inherent in the nature of the objective, negligence-based standard that the duty to inform depends on the facts and circumstances of the case and might, in some circumstances, reach conditions that are unrelated to the final diagnosis.

¶ 90. For the reasons set forth, we reject PIC's two arguments based on the statute and *Scaria:* (1) that the statute and *Scaria* do not apply to diagnostic techniques at all; and (2) that the statute and *Scaria* do not apply to diagnostic techniques for conditions that are unrelated to the final diagnosis. Wisconsin Stat. § 448.30 and *Scaria* declare that a physician's duty is to inform the patient about diagnostic procedures about which a reasonable patient would want to know to make an informed, voluntary decision about his or her medical care, even if those diagnostic procedures are aimed at conditions that are unrelated to the condition that was the final diagnosis.

76

## B

¶ 91. PIC argues that the court of appeals' decision improperly conflates the issues of negligent care and diagnosis and informed consent.[63] According to PIC, the jury's verdict on Jandre's informed consent claim was inconsistent with the jury's verdict that Dr. Bullis was not negligent because she chose one diagnostic method rather than another and was not negligent in the care and treatment of Jandre.

¶ 92. PIC contends that the circuit court and court of appeals gave Jandre "two kicks" at his unsuccessful claim of misdiagnosis by enabling Jandre to fault the diagnosis a second time in the guise of the informed consent claim. PIC's basic argument is that it is anomalous to impose liability for breach of the duty to inform the patient when, as in the present case, the physician was not negligent in her care and diagnosis of the patient.

██ ██

¶ 93. Under Wisconsin law, negligence in failing to abide by the professional standard of care and negligence in failing to obtain informed consent are two separate and distinct forms of malpractice, with two different standards of care. "A failure to diagnose is one form of medical malpractice. A failure to obtain informed consent is another discrete form of malpractice, requiring a consideration of additional and different factors."[64] There is nothing anomalous or inconsistent

---

[63] Judge Fine makes the same argument in his concurrence in the court of appeals. *See Jandre,* 330 Wis. 2d 50, ¶ 48 (Fine, J., concurring).

[64] *Hannemann,* 282 Wis. 2d 664, ¶ 40 (quoting *Finley v. Culligan,* 201 Wis. 2d 611, 628, 548 N.W.2d 854 (Ct. App. 1996) (internal quotation marks omitted)).

in holding that a reasonable patient may want information about alternative diagnostic techniques when the physician was not negligent in using one of multiple alternative, non-negligent techniques. In fact, to hold otherwise would substantially undercut the reasonable patient standard.[65]

¶ 94. In two of this court's prominent informed consent cases, we explained how juries can find that a physician was not negligent in care and treatment but could also find the physician negligent in discharging his or her duty to inform the patient.[66] A jury can reach two different findings without the findings being anomalous or contradictory because the jury has applied different standards of care to the two claims.

■

¶ 95. The standard of care for treatment, care, and misdiagnosis claims is a professional standard, a reasonable physician standard. Physicians are held to the level of a hypothetical, reasonable physician in similar circumstances. In the present case, testimony established that there was more than one method for diagnosing Jandre's condition. The jury was free to conclude (and apparently did conclude) under the reasonable physician standard of care that Jandre's symptoms fit both Bell's palsy and TIA/RIND, and that Dr. Bullis' conduct in not ordering the carotid ultrasound before diagnosing Bell's palsy was reasonable professional care under the circumstances.

---

[65] In concluding that the jury's verdicts were inconsistent, the dissent fails to grapple with the fact that there are two separate standards at play, one governing the claim of negligent care and treatment and another governing the informed consent claim.

[66] See Bubb, 321 Wis. 2d 1, ¶¶ 75–78; Martin, 192 Wis. 2d at 166–67.

¶ 96. In contrast, the standard governing informed consent is the reasonable patient standard. Under this standard, the jury is asked, "[G]iven the circumstances of the case, what would a reasonable person in the patient's position want to know in order to make an intelligent decision with respect to the choices of treatment or diagnosis?"[67] Physicians may not rely on professional custom to determine the scope of informed consent in the way that they can rely on it with respect to treating, caring, and diagnosing. Regardless of what disclosures might be customary in the medical profession, physicians must put themselves into the shoes of the patient and consider what information a reasonable patient would want to know.

¶ 97. No test for Bell's palsy exists. It is a diagnosis reached by excluding other possible ailments. The jury was free to decide (and apparently did decide) under the reasonable patient standard that Dr. Bullis should have told Jandre that she could not conclusively exclude an ischemic stroke event from her differential diagnosis based on her physical examination and that a carotid ultrasound could be ordered to clarify her diagnosis of his condition.

¶ 98. The duty to disclose in the instant case was triggered precisely because there was more than one reasonable diagnostic procedure available to diagnose Jandre's condition. Although a physician is "at liberty to select any of the recognized methods"[68] of diagnosis, the physician is not at liberty to fail to disclose the availability and prospects for success of recognized alterna-

---

[67] *Martin,* 192 Wis. 2d at 176 (emphasis added).

[68] *See* Wis JI—Civil 1023.

tive procedures, especially where, as here, the alternative procedure is non-invasive and more importantly, is more conclusive than the alternative diagnostic tool actually selected by the physician. To hold otherwise would be to deny patients the right to self-determination that the informed consent doctrine and Wis. Stat. § 448.30 are meant to protect.

¶ 99. PIC's forceful argument to the contrary notwithstanding, we conclude that the issues of negligent diagnosis and informed consent are not conflated, contradictory, or anomalous in the present case. It is PIC, not the circuit court or court of appeals, that is conflating a physician's duty of care with her or his duty to disclose information to the patient.

¶ 100. The very same argument PIC makes in the present case was made by the physician-defendant in the *Martin* case. The physician-defendant argued in *Martin:*

> If [the physician] was not negligent in failing to diagnose the epidermal hematoma, or in failing to conclusively rule out an epidermal hematoma, and/or in admitting [the patient] to a hospital with no neurosurgical capability, then *as a matter of law* [the physician] cannot be negligent for failing to discuss a diagnosis which he did not make, and treatments which [the physician] did not judge necessary.[69]

¶ 101. The court rejected this argument in the *Martin* case in 1995, and no compelling reasons have been brought forth for the court to reverse precedent and accept the argument now.

---

[69] Combined Cross-Petitioner's Brief, Response Brief & Appendix of Defendants-Third Party Plaintiff-Respondents-Cross-Petitioners, Brief on Cross-Petition at 14–15, *Martin v. Richards,* 192 Wis. 2d 156, 531 N.W.2d 70 (1995) (No. 91–0016).

80

C

¶ 102. As we have noted, PIC urges the court to adopt a bright-line rule limiting a physician's duty to disclose to information about the final diagnosis and related conditions. Above, we rejected PIC's argument that Wis. Stat. § 448.30 and *Scaria* compel this limitation.

¶ 103. PIC also argues that under *Martin,* the physician does not have a duty to inform the patient about conditions unrelated to the condition diagnosed. We disagree with PIC's formulation of *Martin's* holding. PIC creates a holding that fits the facts of *Martin,* but it is not the holding that the *Martin* court actually adopted.

¶ 104. The facts of *Martin* are substantially similar to the facts of the present case, and the plain language of the holding in *Martin* applies in the present case. *Martin* declared that Wis. Stat. § 448.30 and *Scaria* require that "a physician disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment *or diagnosis.*"[70] Nothing in the *Martin* decision limits the scope of a physician's duty to inform a patient about diagnoses of conditions related to the final diagnosis. PIC reads a limiting principle into *Martin's* holding that was not envisioned by the *Martin* court.

¶ 105. In *Martin,* an emergency room physician came up with a differential diagnosis that included concussion, contusion, and intracranial bleeding. After performing neurological tests, the ER physician ultimately diagnosed the patient as having a concussion. The physician did not order an available, non-invasive

---

[70] *Martin,* 192 Wis. 2d at 175 (emphasis added).

diagnostic procedure (a CT scan), despite knowing that such a procedure would exclude or reveal a dangerous condition, namely an intracranial bleed. The physician also failed to inform the patient that the hospital did not have a neurosurgeon who could be summoned should complications arise. Sadly, neurological complications did develop. The patient was transferred to another hospital where a CT scan revealed intracranial bleeding. The patient survived two emergency surgeries but emerged from the ordeal with spastic quadriplegia. A lawsuit ensued.

¶ 106. The *Martin* jury found that while the ER physician had not been negligent in diagnosing or treating the plaintiff-patient, the physician had been negligent in failing to disclose to the plaintiff-patient the availability of a CT scan, a diagnostic technique that could have led to a more conclusive diagnosis.

¶ 107. PIC asserts that *Martin*'s holding is limited to requiring information about diagnostic procedures for conditions related to the physician's diagnosis. According to PIC, the duty to inform extended to the availability of a CT scan because intracranial bleeding is related to the physician's final diagnosis of concussion. According to PIC, the same cannot be said of an ischemic stroke event and Bell's palsy. PIC's interpretation of *Martin* relies heavily on the distinction between final and differential diagnoses and between diagnostic procedures and medical treatment.

¶ 108. Applying its interpretation of *Martin* to the present case, PIC argues that the physician's duty does not extend to the availability of a carotid ultrasound because ischemic stroke events (which appeared in the differential diagnosis) are unrelated to the physician's final diagnosis of Bell's palsy.

¶ 109. In the present case, however, without a carotid ultrasound, Dr. Bullis admittedly could not be sure of her diagnosis. The uncertainty about the cause of Jandre's symptoms, the potentially grave and immediate risks of some of the possible causes, and the availability of a diagnostic tool that could lead to a more definitive diagnosis gave rise to a legitimate question for the jury regarding whether Dr. Bullis violated her duty of informed consent. The essence of the *Martin* decision, Wisconsin's informed consent doctrine, and Wis. Stat. § 448.30 is that "[w]hen a reasonable person would want to know about an alternative treatment *or method of diagnosis* such as a CT scan or hospitalization in a facility with a neurosurgeon, the decision is not the doctor's alone to make."[71]

¶ 110. In both *Martin* and the present case, the availability of a more reliable, alternative diagnostic technique, coupled with the potentially severe consequences of an incorrect diagnosis, led the jury to find that a reasonable person in the patient-plaintiff's position would have wanted to know about the alternative diagnostic procedures.

¶ 111. PIC's attempt to limit the scope of a physician's duty to inform the patient about the final diagnosis and "related" conditions was not accepted in *Martin*. The *Martin* court explicitly concluded that "it was [the] *condition*" of the patient, that is, the symptoms that the patient displayed, that "drives the duty to inform in this case," "not the *diagnosis*."[72]

¶ 112. We apply the principle stated in *Martin* that it is Jandre's condition, not Dr. Bullis' diagnosis of

---

[71] *Id.* at 181.
[72] *Id.* at 180–81.

Bell's palsy, that drives the scope of Dr. Bullis's duty to inform Jandre in the present case. Jandre's symptoms indicated that he might be suffering from any number of conditions, of which a stroke seemed one of the most plausible and most capable of inflicting immediate, severe harm. Dr. Bullis diagnosed Bell's palsy, but she knew or should have known that her chosen method for ruling out an ischemic stroke event was incapable of definitively doing so.

¶ 113. In other words, a "known and non-remote" risk attached to Dr. Bullis's chosen method of diagnosis that she would not detect a significant occlusion of Jandre's carotid artery. Despite the chosen method of diagnosis being found by the jury to have been reasonable from the vantage of the physician, the jury found, and the evidence supports, that it was unreasonable, from the vantage of a patient in Jandre's position, that Dr. Bullis failed to disclose the availability of a more definitive, non-invasive diagnostic tool.

¶ 114. Again, according to *Martin,* the duty to disclose is not shaped by the physician's final diagnosis. It is shaped by the patient's condition and what a reasonable patient would want to know. Based on what the physician knows (or should know) about the patient's condition, the physician must determine what information a reasonable patient in that situation would want in order to make an intelligent, informed decision regarding treatment.[73]

¶ 115. The *Martin* court concluded that "there is a duty imposed on the physician to disclose to the patient the existence of any methods of *diagnosis* or treatment that would serve as feasible alternatives to the method initially selected by the physician *to diagnose* or treat

[73] *Id.*

the patient's illness or injury."[74] Nothing in the *Martin* decision explicitly or inferentially creates a rule that physicians are required to inform the patient only about the condition diagnosed and related conditions.

¶ 116. Accordingly, we conclude that PIC tries to make *Martin* stand for something different than it truly does. The *Martin* case did not hold that the scope of required disclosure is limited to information about the condition diagnosed and related conditions. We acknowledge that such a holding could have been reached from the facts of *Martin,* but the *Martin* court did not choose to adopt it. PIC attempts to create this holding after the fact, by assuming that it must be what the court intended because it is plausible based on the facts of *Martin.* We decline to read limitations into *Martin*'s holding that do not exist in the *Martin* court's reasoning or the plain language of the decision and are inconsistent with the reasonable patient standard. *Martin*'s holding did not create any bright-line rules.

¶ 117. For the reasons set forth, we conclude there is no basis for distinguishing the present case from *Martin. Martin* stands as controlling precedent.

D

¶ 118. PIC also argues that this court's holding in *Bubb v. Brusky* supports its position that the physician does not have a duty to inform the patient about conditions or diagnostic techniques unrelated to the physician's final diagnosis. We disagree with PIC's formulation of *Bubb*'s holding. PIC creates a holding that

[74] *Id.* at 176 (emphasis added) (quoting John H. Derrick, Annotation, *Medical Malpractice: Liability for Failure of Physician to Inform Patient of Alternative Modes of Diagnosis or Treatment,* 38 A.L.R. 4th 900, 903 (1985)).

fits the facts of *Bubb,* but it is not the holding that the *Bubb* court actually adopted. We conclude, as we did in our discussion of *Martin,* that PIC creates a holding for *Bubb* that the court did not adopt.

¶ 119. PIC notes that in *Bubb,* the final diagnosis (TIA) included a well-acknowledged, significantly increased risk of ischemic stroke. For PIC, this relationship between the two conditions is crucial. PIC concludes that it was the relatedness of TIA and ischemic stroke that allowed the jury to conclude that a physician had a duty to inform the patient about a test for ischemic stroke.

¶ 120. In contrast, in the present case, according to PIC, the final diagnosis was Bell's palsy, and "a carotid ultrasound would have been of no use in diagnosing or treating [such a condition]."[75] Therefore, PIC contends that, as a matter of law, Dr. Bullis should not have a duty to inform Jandre about the availability of the procedure. PIC reasons that once Dr. Bullis provided Jandre with information about Bell's palsy and medication for Bell's palsy, she had satisfied her disclosure duties.

¶ 121. PIC's interpretation of *Bubb* demonstrates a basic misunderstanding of our holding in *Bubb* (and prior case law) as having been premised on and limited to conditions associated with the final diagnosis. Neither the *Bubb* court nor any other decision adopted such a ruling explicitly or implicitly.

¶ 122. Rather, the *Bubb* court continued the prior case law, holding: "Wis. Stat. § 448.30 requires any physician who treats a patient to inform the patient

---

[75] Opening Brief & Appendix of Petitioners Physicians Ins. Co. of Wis. & Therese J. Bullis, M.D. at 28.

about the availability of all alternate, viable medical modes of treatment, *including diagnosis,* as well as the benefits and risks of such treatments."[76]

¶ 123. The facts in *Bubb* are substantially similar to those in the present case and *Bubb*'s explicit holding governs the present case: The reasonable patient standard applies.

¶ 124. Bubb's wife took him to the emergency room because he was having trouble ingesting food and maintaining his equilibrium.

¶ 125. The emergency room physician, Dr. Brusky, ordered several tests for Bubb including a CT scan, an EKG, and various blood tests. Bubb's symptoms began to diminish and Dr. Brusky concluded that Bubb had a TIA. Upon advice of Dr. Brusky and Dr. Gu, a neurologist, Bubb was discharged, and Dr. Gu agreed to provide follow-up treatment. The after-care instructions advised Bubb that a TIA is a strong warning sign that a stroke could occur.[77] The next day, Bubb called the specialist to schedule a follow-up appointment. The day after that, Bubb suffered a significant stroke. A carotid ultrasound revealed that his right carotid artery was 90 percent blocked.

¶ 126. Bubb sued the physicians, alleging negligent medical care, and more important for the present case, alleging that the physicians failed to inform him of " 'additional diagnostic tests or alternate treatment plans' in lieu of discharge from the hospital."[78]

¶ 127. The circuit court in *Bubb* refused to give the jury the informed consent instructions and special verdict questions (substantially the same instructions

[76] *Bubb,* 321 Wis. 2d 1, ¶¶ 3, 78.

[77] *Id.,* ¶ 9 n.3.

[78] *Id.,* ¶ 12.

and verdict questions given in the present case). The circuit court reasoned that Dr. Brusky made a "specific diagnosis" of TIA that every expert agreed was correct; that Dr. Brusky told Bubb he was at risk for a stroke and should have a follow-up soon; and that Dr. Brusky knew that a carotid ultrasound could not be performed at the hospital until the following day.[79] The jury returned a verdict of no negligence on the part of either Dr. Brusky or Dr. Gu in the standard of care they delivered to Bubb.

¶ 128. Bubb appealed to the court of appeals and then sought review in this court, claiming that the circuit court improperly withheld the informed consent jury instructions and special verdict questions from the jury's consideration.

¶ 129. The *Bubb* court traced the development of the law of informed consent and reaffirmed *Martin*'s holding that the scope of a physician's duty to inform a patient "is driven ... by what a reasonable person under the circumstances then existing would want to know, i.e., what is reasonably necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis."[80]

¶ 130. Grounding its holding in the statutory language, the *Bubb* court also articulated the duty of informed consent as requiring "any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, including diagnosis, as well as the benefits and risks of such treatments."[81]

---

[79] *Id.,* ¶ 21.

[80] *Id.,* ¶ 62 (quoting *Martin,* 192 Wis. 2d at 174) (emphasis added in *Bubb*).

[81] *Id.,* ¶ 78 (emphasis added).

¶ 131. After deciding the applicable law, the *Bubb* court then stated that it would decide "whether there was *any* credible evidence in the record for the jury to determine that Dr. Brusky was negligent in failing to adequately inform the Bubbs regarding 'alternate, viable medical modes of treatment' " for the patient's TIA.[82] The *Bubb* court concluded that credible evidence existed to show that further diagnostic treatment was a reasonable alternative mode of treatment to the one prescribed, which was discharge from the hospital.[83]

¶ 132. Having determined that an alternative mode of treatment existed, the court next asked, "[C]ould the Bubbs have 'ma[d]e an informed, intelligent decision to consent' to Dr. Brusky's suggested mode of treatment—discharge from the hospital with instructions for follow-up care—without being informed of the alternative—admission to the hospital with further diagnostic testing?"[84] The answer, according to *Bubb,* hinges on what a reasonable person under the circumstances then existing would want to know.

¶ 133. The *Bubb* court determined that "a reasonable jury could conclude that a reasonable person in [Bubb]'s condition would have wanted to know about the alternative of admission with further diagnostic testing."[85] The conclusion was based on evidence that Bubb had an increased risk of stroke; that the consequences of a stroke are severe; and that a blocked artery, which could cause a stroke, was a possible cause of Bubb's condition.[86] The *Bubb* court concluded that

---

[82] *Id.,* ¶ 31.

[83] *Id.,* ¶¶ 40, 70.

[84] *Id.,* ¶ 71 (quoting *Martin,* 192 Wis. 2d at 174).

[85] *Id.,* ¶ 72.

[86] *Id.*

the circuit court erred in dismissing Bubb's claim of the physician's breach of the duty to inform.[87]

¶ 134. Applying a similar analysis to the present case, we conclude that there was credible evidence in the record that would allow a reasonable jury to find Dr. Bullis negligent for failing to inform Jandre about an alternate, viable mode of treatment. There was testimony that using the carotid ultrasound was an accepted, alternative course of action that could have been employed in diagnosing Jandre's condition. In fact, two experts testified that had they seen Jandre when he initially appeared at the emergency room, that is the course they would have taken.

¶ 135. That other physicians would have pursued a different course does not compel a finding that the treating physician's care and diagnosis was negligent. It simply highlights that a reasonable alternative course of treatment existed—ordering a carotid ultrasound to assess the state of Jandre's carotid arteries rather than, or in addition to, conducting a physical exam.[88]

¶ 136. The jury concluded that a reasonable person in Jandre's circumstances would want to know that a carotid ultrasound was available, which could more

---

[87] *Id.,* ¶¶ 4, 28.

[88] The *Bubb* court noted that "the circuit court's decision to include the alternative paragraph to the standard medical negligence jury instruction, which is to be used 'only if there is evidence of two or more alternative methods of treatment or diagnosis recognized as reasonable,' demonstrates that credible evidence was presented to show that a reasonable alternative mode of treatment existed." *Bubb,* 321 Wis. 2d 1, ¶ 70. The same alternative instruction was given to the jury in the present case.

accurately assess the state of the patient's carotid arteries and affirm or call into question the physician's diagnosis of Bell's palsy.

¶ 137. The jury found that Jandre could not make an informed, intelligent decision to consent to Dr. Bullis's suggestion of discharge from the hospital with instructions to follow up with a physician without being informed that a carotid ultrasound could be ordered to eliminate the possibility of an ischemic stroke.

¶ 138. PIC no longer challenges the sufficiency of the evidence, but examining the evidence in the present case and comparing it to the evidence in *Bubb* help to demonstrate that the two cases are similar in fact and law.

¶ 139. Although the cases can be distinguished on the ground that the two conditions were "related" in *Bubb,* that distinction does not warrant a different outcome under the reasonable patient standard.

¶ 140. In the present case, the jury's finding of a breach of the physician's duty to inform the patient is supported by several pieces of evidence, namely, (1) evidence that Jandre's symptoms were atypical of Bell's palsy and could also have been caused by an ischemic stroke event; (2) evidence of the severe consequences that can result from a stroke; (3) evidence that Dr. Bullis's method of ruling out ischemic stroke, while non-negligent, did not definitively eliminate the possibility that Jandre's condition was caused by a blocked carotid artery; and (4) the availability of carotid ultrasound, a non-invasive diagnostic tool. These facts demonstrate that it was reasonable for the jury to conclude that a reasonable person in Jandre's condition would have wanted to know about the alternative diagnostic tool of a carotid ultrasound.

91

¶ 141. Notably, this analysis holds true despite the fact that Bell's palsy is "unrelated" to stroke. As we have stressed, PIC's attempt to create a bright-line rule limiting the scope of required disclosure to the final diagnosis and related conditions is inconsistent with the reasonable patient standard, Wis. Stat. § 448.30, and case law.

■

¶ 142. From the perspective of the patient, the materiality of a risk has nothing to do with whether that risk comes from a potential condition that is related to the final diagnosis, as in *Martin* and *Bubb,* or from a potential condition that the physician has eliminated, though not unequivocally, as in the present case.

¶ 143. In *Martin,* there was a one to three percent chance of intracranial bleeding. The court held that this was sufficiently non-remote to uphold the jury's finding that disclosure was required.[89] Here, while neither party has attempted to assign percentages to the various risks, there was clearly a risk that Dr. Bullis's treatment, while reasonable, would fail to discover that Jandre's carotid artery was significantly blocked, and a risk that the undetected blockage might result in a stroke. Nothing in the record suggests that the jury was unreasonable in finding that these risks were sufficiently non-remote that a reasonable person in Jandre's position would want to know about the availability of a carotid ultrasound.

¶ 144. For these reasons, we reject PIC's proposed bright-line rule and stress that *Martin* and *Bubb* did not hold that a physician had a duty to inform the patient only of information about the final diagnosis and related conditions, as PIC urges. We acknowledge that

---

[89] *Martin,* 192 Wis. 2d at 167–68.

such a holding could plausibly have followed from the facts of *Martin* and *Bubb,* but it is clear that the court in those cases did not adopt such a holding. Rather, the court embraced the reasonable patient standard that is articulated in Wis. Stat. § 448.30 and the case law. We do the same.

E

¶ 145. PIC next points to the court of appeals' decision in *Kuklinski v. Rodriguez,* 203 Wis. 2d 324, 552 N.W.2d 869 (Ct. App. 1996), and proposes another, similar bright-line rule. PIC argues that *Kuklinski* stands for the proposition that "the duty to inform should not attach until a diagnosis has been made."[90] The court of appeals observed that PIC "misrepresents the holding of *Kuklinski.*"[91]

¶ 146. We do not read *Kuklinski* as PIC does. We read *Kuklinski* as standing for the important proposition that a physician's duty to provide information is necessarily limited by what the physician knows, or reasonably should know, at the time the patient contends a disclosure should have been made.[92] Thus, the court of appeals aptly held that "a physician is not negligent for failing to disclose unless he or she . . . had sufficient knowledge about the patient's condition to trigger the physician's awareness that the information was reasonably necessary for the patient . . . to make an

[90] Opening Brief & Appendix of Petitioners Physicians Ins. Co. of Wis. & Therese J. Bullis, M.D. at 31.

[91] *Jandre,* 330 Wis. 2d 50, ¶ 32.

[92] *Kuklinski,* 203 Wis. 2d at 330.

93

intelligent decision regarding the patient's medical care . . . ."[93]

¶ 147. The physician in *Kuklinski* testified that his initial diagnosis was that Kuklinski did not suffer a head injury. It was only when Kuklinski's symptoms changed that the physician thought of a head injury.

¶ 148. According to the jury, Kuklinski's initial symptoms did not trigger the physician's awareness that the availability of a CT scan was something a reasonable patient would want to know. Accordingly, the court of appeals ruled that there was sufficient evidence to support the *Kuklinski* jury's finding that the physician was not negligent, either with respect to care and treatment of the patient or in connection with the failure to inform the patient that a CT scan was an available diagnostic tool.[94]

---

[93] *Id.*

[94] "Given what the jury could reasonably conclude Dr. Rodriguez knew at the time that the Kuklinskis claim that he should have discussed with them the availability of a CT scan, the jury's finding that Dr. Rodriguez was not negligent on the informed-consent issue must be upheld." *Kuklinski,* 203 Wis. 2d at 334.

The dissent misstates *Kuklinski*'s holding by claiming the case "holds that there was no reason to inform the patient of the availability of a CT scan when the patient came into the emergency room because the *physician's initial diagnosis* of Mr. Kuklinski was that he had a 'minor head injury.' " Dissent, ¶ 305 (emphasis added). *Kuklinski*'s holding was not dictated by the physician's initial diagnosis; it was dictated by the patient's condition and what that condition should have (or should not have) triggered in the physician's mind. *See also Martin,* 192 Wis. 2d at 180–81 ("It was this *condition . . . not the diagnosis,* that drives the duty to inform in this case.") (emphasis added).

¶ 149. In the present case, unlike in *Kuklinski,* the jury evidently concluded that Dr. Bullis had sufficient information to know that Jandre might have suffered an ischemic stroke event and that a reasonable patient would want to know about a carotid ultrasound that might have detected the event.

¶ 150. The jury in the present case and the jury in *Kuklinski* reached different conclusions on different facts. But the juries in the two cases applied the identical law: the reasonable patient standard, which is not constrained by the bright-line rules urged by PIC.

¶ 151. Again, it is the patient's condition, not the physician's diagnosis, that drives the duty to disclose. Whether the physician had reached a final diagnosis is irrelevant to the question in *Kuklinski,* which was whether the physician had enough information at a given moment to know that a reasonable patient would want certain information disclosed.

¶ 152. PIC does not persuade us that *Kuklinski* supports its position that the physician's duty to inform should not attach until a diagnosis has been made.

F

¶ 153. Having determined that well-established precedent in Wisconsin supports the judgment of the circuit court affirming the jury verdict and that the present case has not deviated from precedent or gone astray from the theoretical underpinnings of the reasonable patient standard of informed consent, we now turn to the public policy arguments advanced by PIC and several concerned amici. Many of the policy arguments have been made in prior cases and are very familiar to the court. None warrants altering the reasonable patient standard in informed consent cases.

(1)

¶ 154. PIC and amicus assert, as Judge Fine asserted in his concurrence in the court of appeals, that the court of appeals' decision makes physicians essentially strictly liable when a bad result occurs.[95] As we explained earlier, to the extent that PIC suggests informed consent liability is literally a form of strict liability, the argument is entirely unfounded. It is clear from Wis. Stat. § 448.30 and the case law that the scope of the duty of informed consent is shaped by objective, negligence-based standards.[96] The liability that physicians face in informed consent cases is not strict, in theory or in practice.[97]

¶ 155. If the suggestion is that the liability is "essentially" strict liability because juries' hindsight

---

[95] *See* Amicus Curiae Brief of Dean Health Sys., Inc., Marshfield Clinic, & Gundersen Lutheran Health Sys., Inc. at 2.

[96] *See, e.g., Bubb,* 321 Wis. 2d 1, ¶ 54.

[97] The dissent repeatedly asserts that our holding results in strict liability for physicians, but does not explain the basis for that assertion.

The concurrence similarly questions whether this opinion will "serve to prevent strict liability in fact or perception." Concurrence, ¶ 235. The concurrence also states, however, that "[i]t is hard to dispute that a *reasonable* person under the circumstances confronting Jandre would want to know the possibility that he had suffered some kind of stroke—and that a non-invasive diagnostic technique (a carotid ultrasound) was available at the hospital to confirm or eliminate that possibility." Concurrence, ¶ 208 (emphasis added). We could not agree more. It is precisely because a *reasonable* person in Jandre's circumstances would have wanted the additional information that liability under the reasonable patient standard is appropriate and is not strict. Had Jandre's desire for more information or more testing been unreasonable, liability would not follow.

bias and sympathy for a seriously stricken patient inhibit jurors from faithfully applying the reasonable patient standard, we are still not persuaded that a deviation from established precedent is warranted. The concern that juries will always find for the plaintiff if a bad result has come to fruition is not only overblown, but also demonstrates a mistrust of juries that cannot logically be limited to informed consent cases. Cases like *Kuklinski* demonstrate that juries are capable of applying the objective standard fairly.

¶ 156. Were we to alter our doctrine out of fear that juries could not be trusted to faithfully apply the law, we would need to reconsider the role of the jury in all negligence cases, and in our legal system as a whole.

¶ 157. There are, as we have pointed out previously, limitations on physicians' liability inherent in the objective reasonable patient standard and expressly included in Wis. Stat. § 448.30 that protect physicians from unpredictable, unfair liability.

¶ 158. Finally, it is noteworthy that in *Martin,* the physician-defendant made an essentially identical argument, which the court rejected. The physicians in *Martin* argued that "if physicians can be sued under [Wis. Stat. § 448.30] for failing to inform a patient [of information relating to] a diagnosis considered but discarded as unlikely . . . the effect would be to make physicians guarantors of their conduct."[98] This argument is no more persuasive today than it was in 1995 when the court decided the *Martin* case.

---

[98] Combined Cross-Petitioner's Brief, Response Brief & Appendix of Defendants-Third Party Plaintiff-Respondents-Cross-Petitioners, Brief on Cross-Petition at 26, *Martin v. Richards,* 192 Wis. 2d 156, 531 N.W.2d 70 (1995) (No. 91–0016).

(2)

¶ 159. PIC next argues that the court of appeals' decision inappropriately shifts medical judgment from the physician to the patient, usurping the physician's role. In other words, PIC contends that Dr. Bullis's decisions regarding diagnosis were "medical" decisions.

¶ 160. This argument was squarely rejected in *Martin* and again in *Bubb*. In *Martin*, the court reasoned as follows:

> [The doctor] further argues that these are medical decisions. In essence he states, "Why should we inform the patient that we don't think we should do something?" This misses the very point of the statute. When a reasonable person would want to know, the decision is not the doctor's alone to make.
>
> . . . .
>
> It may well be a "medical decision" under these circumstances to decide not to do a CT scan . . . . The statute on its face says, however, that the patient has the right to know, with some exceptions, that there are alternatives available.[99]

¶ 161. We were not persuaded then, and we are not persuaded now, that the physician's duty of informed consent allows patients to usurp the physician's role to make medical decisions. This argument flies in the face of the patient's right to self-determination, which is at the heart of the informed consent doctrine, and is reminiscent of the paternalistic "doctor-knows-best" attitude that the court has long rejected.[100]

---

[99] *Martin,* 192 Wis. 2d at 181. *See also Bubb,* 321 Wis. 2d 1, ¶ 66 (quoting *Martin*'s analysis of this argument).

[100] *See, e.g., Martin,* 192 Wis. 2d at 181 ("The doctor might decide against the alternate treatments or care, he might try to persuade the patient against utilizing them, but he must inform

¶ 162. PIC asserts that affirming the jury verdict imposes an undue burden on physicians, particularly emergency room physicians. PIC contends that "to avoid the risk of later being held liable Dr. Bullis would have had to provide information about diagnostic options and treatments for *all* of the conditions in her differential diagnosis . . . ."[101] Accordingly, PIC contends that affirming the decision of the court of appeals will result in unduly burdening medical care and will cause skyrocketing costs. PIC significantly misstates the ramifications of our decision.

¶ 163. The limitations on the physician's duty to inform the patient that are imposed by the reasonable patient standard function to make the duty of informed consent manageable for emergency room physicians, like Dr. Bullis. In *Bubb,* the court specifically addressed the argument that the duty of informed consent would hold emergency room physicians to an unattainable standard because it would force them "to have specialized knowledge in many areas of medicine in which they are not trained."[102] The *Bubb* court pointed to the express limitations in the statute, particularly Wis. Stat. § 448.30(1), which provides that a physician is not liable for failing to disclose "[i]nformation beyond what

them when a reasonable person would want to know."); *Scaria,* 68 Wis. 2d at 12 ("Because of the patient's lack of professional knowledge, he cannot make a rational reasonable judgment unless he has been reasonably informed by the doctor of the inherent and potential risks. . . . The need of a particular patient for competent expert information should not necessarily be limited to a self-created custom of the profession.").

[101] Opening Brief & Appendix of Phys. Ins. Co. of Wis. & Therese J. Bullis, M.D. at 35.

[102] *Bubb,* 321 Wis. 2d 1, ¶ 75.

a reasonably well-qualified physician *in a similar medical classification* would know" (emphasis added).[103] Emergency room physicians are not asked to have specialized knowledge beyond their training. This limitation protects emergency room physicians from being held to a level of specialized knowledge that is unrealistic.

¶ 164. PIC also argues that emergency room physicians do not have time to provide the information required by the court of appeals' opinion to patients. Emergency room physicians are not asked to discuss *all* options and possibilities with patients whom they see briefly. Negligence-based standards that govern informed consent are capable of being applied fairly across different circumstances and contexts.

¶ 165. We simply hold that there are circumstances in which a combination of facts may create a duty in an emergency room physician to inform the patient about a diagnostic option that addresses a condition that was eliminated on the way to reaching a non-negligent final diagnosis.

¶ 166. The policy arguments PIC advances closely resemble those that the court considered and rejected in *Martin*. In that case, the physician-defendant argued that the court of appeals' decision would force doctors to explain exhaustive lists of alternative diagnostic techniques and the alternative treatments associated with each.[104] The *Martin* court rejected the argument.

---

[103] *Id.,* ¶ 77.

[104] *See* Combined Cross-Petitioner's Brief, Response Brief & Appendix of Defendants-Third Party Plaintiff-Respondents-

¶ 167. The reasonable patient standard does not require disclosure of *all* information, as PIC states. The reasonable patient standard requires a physician to inform the patient of only the information that a reasonable patient would find necessary to make an intelligent, informed decision regarding the physician's recommendations. For example, PIC lists several diagnostic techniques for multiple sclerosis, another condition that appeared on Dr. Bullis's differential diagnosis along with stroke and Bell's palsy, and argues that if it turned out that Jandre had multiple sclerosis, Dr. Bullis would be liable for failing to discuss each of these tests.[105]

¶ 168. PIC's argument misstates how the reasonable patient standard works to limit the physician's duty to inform the patient.

¶ 169. It took a combination of unique facts in the present case to make the availability of a carotid ultrasound something that a reasonable patient would need to know about in order to make an intelligent decision about his health care: The symptoms were indicative of a stroke; the risks posed by a potential ischemic stroke were imminent, sudden, and grave; the method Dr. Bullis chose to eliminate the possibility of an ischemic stroke led to uncertain results, despite the fact that it was accepted as a medically reasonable diagnostic tool; an alternative method of diagnosis (carotid ultrasound) was readily available and was non-invasive; Jandre's symptoms were atypical of Bell's

Cross-Petitioners, Brief on Cross-Petition at 25–26, *Martin v. Richards,* 192 Wis. 2d 156 (1995) (No. 91–0016).

[105] The tests included a "spinal tap," "various imaging techniques," and more.

palsy; and Dr. Bullis's final diagnosis, Bell's palsy, can be reached only by eliminating all other possibilities.

■

¶ 170. We could go on. The point is that the physician's duty to inform the patient depends on the facts and circumstances of each case. The question of breach of the physician's duty to inform a patient is quintessentially a jury question. If any of the facts in the present case had been different, the jury might have found that Dr. Bullis did not breach her duty of informed consent.

■

¶ 171. The thrust of our holding is that the bright line rules PIC urges are inappropriate. The specific facts of each case must be examined to determine the reasonable informational needs of the patient.

¶ 172. For the reasons stated, which are as strong today as they were when the court decided *Martin,* we conclude that PIC's concerns are overstated.

(4)

¶ 173. PIC argues that our decision will cause health care costs in Wisconsin to skyrocket because patients will demand that physicians perform every conceivable diagnostic test and doctors will face increased liability.[106] One amicus argues that "it will

---

[106] Judge Fine noted that the likely outcome is an increase in defensive procedures and "no ceiling to the already rocketing health-care costs because of the plethora of unnecessary tests and procedures . . . ." *Jandre,* 330 Wis. 2d 50, ¶ 48 (Fine, J., concurring).

Some commentators would likely predict more positive outcomes. *See, e.g.,* George D. Bussey, *Keomaka v. Zakaib: The*

follow that some patients will want every conceivable test done *whether reasonable or not.*"[107]

¶ 174.　These statements again betray a fundamental misconception about how the reasonable patient standard operates. Physicians have no duty to provide information to patients about tests that would not be material to a reasonable patient. The holding in the present case does not give patients leave to request all conceivable tests. Nor do physicians have a duty to perform tests that are not medically reasonable.

¶ 175.　PIC and amici also worry that the duty to inform imposed in the present case will encourage the practice of defensive medicine. With respect to this concern, one scholar notes:

> "Defensive medicine" has, indeed, . . . rarely [been] defined in any but the most vague and illusive terms. If, however, "positive defensive medicine" is taken to involve the subjection of the patient to procedures which are not medically indicated, in order to forestall adverse legal action, then a clear-headed [understanding of the

*Physician's Affirmative Duty to Protect Patient Autonomy Through the Process of Informed Consent,* 14 U. Haw. L. Rev. 801, 824 (1992) (discussing studies that showed that increased disclosure often led to patient selection of the least invasive, least expensive diagnostic procedure available with the same or similar chances of misdiagnosis); Jaime Staples King & Benjamin W. Moulton, *Rethinking Informed Consent: The Case for Shared Medical Decision-Making,* 32 Am. J.L. & Med. 429, 475–76 (2006) (suggesting that any increased expense as a result of more patient involvement in medical decision making could be offset by cost savings due to a reduction in frivolous claims brought by patients dissatisfied with physicians' poor communication).

[107] Brief Amicus Curiae on Behalf of the Wis. Med. Soc'y, Inc., the Wis. Hosp. Ass'n, Inc., & the Wis. Chapter of the Am. College of Emergency Physicians, Inc. at 9 (emphasis added).

physician's duty of care] shows that the adoption of such practices is most ill-advised from the doctor's point of view. Since this type of defensive medicine is by definition superfluous to the patient's needs, the doctor far from discharging his legal duty of care is merely increasing the possibility of careless error and thereby the possibility of an action for medical negligence. On the other hand, if the procedure is for the patient's benefit, it cannot be said to be superfluous and the doctor who undertakes it is merely complying with his legal obligation to exercise due care and skill in the treatment and diagnosis of his patients. "Negative defensive medicine," which may be said to involve the omission of medically indicated procedures out of a similar sense of fear on the doctor's part, is equally foolhardy. In all jurisdictions it has been held that any deviation from the legal standard of care which results in damage or injury will lead to liability in negligence and a concomitant obligation to compensate *the patient.*[108]

¶ 176. This opinion does not expand the duty of informed consent in Wisconsin. It simply applies well-established, objective, negligence-based principles to a particular fact situation. Patients are not entitled to more information or tests after this opinion than they were before. Physicians are at no greater risk of liability after this opinion than they were before and therefore should feel no additional pressure to practice defensively.

(5)

¶ 177. PIC expresses a concern that if the jury verdict is affirmed in the present case, proper diagnos-

---

[108] Dieter Giesen, *Vindicating the Patient's Rights: A Comparative Perspective,* 9 J. Contemp. Health L. & Pol'y 273, 307 (1993) (emphasis added, footnotes omitted).

tic techniques will be discouraged and physicians will have the "perverse incentive" to abandon the differential diagnosis. Abandoning the differential diagnosis process would be misguided. Like many of the policy arguments made, this one demonstrates a fundamental misunderstanding of the contours of the physician's duty of informed consent.

¶ 178. The court held in *Martin* that it is the patient's condition, not the physician's diagnosis, that drives the scope of the physician's duty to disclose.[109] In that case, the court determined that the diagnosis did not determine what information needed to be shared with the patient. Similarly, we now make clear that a physician does not create disclosure duties by merely including a condition in a differential diagnosis. Nor can a physician avoid disclosure duties by not conducting a differential diagnosis. The patient's condition (*i.e.,* the patient's symptoms), not the diagnosis, drives the duty to disclose.

¶ 179. As the court of appeals aptly noted in *Kuklinski,* a physician is only liable for failing to disclose information if "he or she either had sufficient knowledge about the patient's condition to trigger the physician's awareness that the information was reasonably necessary for the patient . . . to make an intelligent decision regarding the patient's medical care, or should have had that knowledge."[110] Combining the teachings of *Kuklinski* and the teachings of *Martin* makes clear that an attempt to avoid liability by foregoing a differential diagnosis would fail.

[109] *Martin,* 192 Wis. 2d at 180–81.
[110] *Kuklinski,* 203 Wis. 2d at 330.

¶ 180. The scope of required disclosure is driven by (1) the patient's condition, not the physician's diagnosis; and (2) the awareness a physician has (or should have) based on the patient's condition that certain information needs to be disclosed. Dr. Bullis was not negligent because the word "stroke" appeared in her differential diagnosis; she was negligent, according to the jury, because Jandre's condition should have triggered an awareness on her part that information about the availability of a carotid ultrasound would be important to the patient.

¶ 181. Thus, were physicians to abandon differential diagnoses in an effort to avoid informed consent liability, not only would they jeopardize the quality of their work, but they would also fail to change their exposure to liability.

(6)

¶ 182. Both here and in *Martin*, the physicians argued that "extending" the informed consent duty to include alternate modes of diagnosis unrelated to a non-negligent final diagnosis would unnecessarily inundate patients with more information than they can possibly manage. The physicians contend that in this way the very objective of the doctrine of informed consent will be undermined.

¶ 183. We acknowledge that giving too much information to the patient has dangers, but as is the case with so many of the policy arguments, the answer lies in the limitations inherent to the objective, negligence-based reasonable patient standard and the limitations expressly written into Wis. Stat. § 448.30.

¶ 184. The second and fourth limitations provided in Wis. Stat. § 448.30 are particularly relevant to this concern: physicians need not disclose information if it is too technical to be understood by a layperson. Nor must physicians disclose information relating to highly unlikely possibilities. With these limitations in mind, we conclude that PIC's concern that physicians will have no choice but to inundate patients with highly technical information has no force.

(7)

¶ 185. Finally, PIC argues that the circuit court's judgment affirming the jury verdict and the court of appeals' decision affirming the judgment of the circuit court should be reversed because they create a physician's duty of informed consent in Wisconsin that is broader than that recognized in any other state. Other states have concluded that non-negligent diagnosis does not give rise to a physician's duty to inform the patient about risks concerning conditions not diagnosed.

¶ 186. This argument is unpersuasive for a number of reasons.

¶ 187. First, even if Wisconsin's informed consent doctrine is clearly as unique as PIC contends, that would not, in itself, be a sufficient reason for the court to alter prior precedent and reconsider the doctrine.

¶ 188. Second, informed consent is governed in each state by unique statutes and case law. Informed consent in this state is governed by Wis. Stat. § 448.30. Uniformity among the states is not required, nor is it even necessarily desirable.

¶ 189. Third, this court was aware of variations in the law of the scope of informed consent from state to state when it decided *Martin* and again when it decided

*Bubb,* even though cases from other jurisdictions are not explicitly cited in *Martin* or *Bubb.*

¶ 190. The *Martin* court was apparently aware of the scope of the duty of informed consent in other states.[111] In *Martin,* the court considered an A.L.R. annotation that summarized cases across the country that approached the issue of a physician's liability for failure to inform the patient of alternative modes of diagnosis.[112]

¶ 191. In *Bubb,* the court confronted the law of other states even more directly. A brief of a non-party was entirely devoted to the argument that "other courts have uniformly limited the duty to provide informed consent to treatment and procedure options called for by the condition diagnosed."[113]

---

[111] Several cases cited in the briefs in the present case were brought to the *Martin* court's attention for the proposition that requiring disclosure of reasonable and available alternative methods of diagnosis would make Wisconsin unique in terms of the scope of its law of informed consent. *See, e.g.,* Combined Cross-Petitioner's Brief, Response Brief & Appendix of Defendants-Third Party Plaintiff-Respondents-Cross-Petitioners, Brief on Cross-Petition at 25–26, *Martin v. Richards,* 192 Wis. 2d 156 (1995) (No. 91–0016) (referring to *Bays v. St. Lukes Hosp.,* 825 P.2d 319 (Wash. Ct. App. 1992); *Pratt v. Univ. of Minn. Affiliated Hosps. & Clinics,* 414 N.W.2d 399 (Minn. 1987)).

[112] *See Martin,* 192 Wis. 2d at 175–76 (citing John H. Derrick, Annotation, *Medical Malpractice: Liability for Failure of Physician To Inform Patient of Alternative Modes of Diagnosis or Treatment,* 38 A.L.R. 4th 900, 904–06 (1985)).

[113] Brief of Physicians Ins. Co. of Wis. as Amicus Curiae Supporting Respondents at 1, *Bubb v. Brusky,* 2009 WI 91, 321 Wis. 2d 1, 768 N.W.2d 903 (No. 2007AP619).

PIC's amicus brief in *Bubb* brought the following cases, also cited in its brief here, to the court's attention when it argued

¶ 192. The present case, as we have explained previously, does not mark an expansion of Wisconsin's informed consent doctrine. The scope of a physician's duty of informed consent has long been determined, on a case-by-case basis, using the objective, negligence-based reasonable patient standard.[114] The present case is simply an application of these pre-existing principles to a case with very similar facts. Thus, the court today is no more persuaded by the charge that its holding deviates from holdings across the nation than it was 16 years ago when it decided *Martin* or two years ago when it decided *Bubb*.

¶ 193. Fourth and finally, the law in other states does not appear to be as uniform or clear as PIC contends. Some states, like Colorado, endorse a less robust concept of informed consent than Wisconsin.

¶ 194. In *Hall v. Frankel*, 190 P.3d 852 (Colo. App. 2008), the Colorado Court of Appeals described the pivotal question as "whether a physician can be held liable on an informed consent theory when the injury arises from the physician's misdiagnosis of the condition and failure to inform the patient that further diagnostic tests could be performed, which tests the physician has concluded are not medically indicated."[115] The court concluded that "a physician does not have the duty to disclose the risk of an error in diagnosis or to

that reversal of the court of appeals' affirmance of the circuit court's dismissal of the informed consent claims in that case would make Wisconsin's informed consent law an "outlier" with respect to other states' law on the subject: *Hall v. Frankel,* 190 P.3d 852 (Colo. Ct. App. 2008); *Roukounakis v. Messer,* 826 N.E.2d 777 (Mass. App. Ct. 2005); and *Linquito v. Siegel,* 850 A.2d 537 (N.J. Super. Ct. App. Div. 2004).

[114] *See, e.g., Scaria,* 68 Wis. 2d at 12–13.

[115] *Hall v. Frankel,* 190 P.3d 852, 864–65 (Colo. App. 2008).

disclose the availability of diagnostic and treatment procedures he or she has concluded are not medically indicated. Errors of this sort are covered adequately by claims of negligence."[116]

¶ 195. The Colorado court distinguished our *Martin* case, saying that the Wisconsin court was interpreting a statute that codified the state's informed consent doctrine as requiring that " '[a]ny physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments.' "[117] The Colorado court concluded that "Colorado statutes and law do not recognize such a duty".[118]

¶ 196. Other state courts are not as clearly inconsistent with the present case as PIC wishes us to believe. For example, in *Gates v. Jensen*, 595 P.2d 919 (Wash. 1979), the physician diagnosed the problem as eye irritation from contact lenses but could not rule out glaucoma. The physician never told the patient about the possibility of glaucoma or about additional inexpensive tests for glaucoma. Under those facts the Washington court allowed an informed consent suit to continue.[119]

¶ 197. Our holding today does not depend on a detailed analysis of the law of other states. A 50–state survey is not necessary. Whether Wisconsin law represents a majority view or a minority view, we are satisfied that our informed consent doctrine is coherent

---

[116] *Id.* at 865.

[117] *Id.*

[118] *Id.*

[119] The current state of informed consent law in Washington is not clear. *Gates v. Jensen*, 595 P.2d 919 (Wash. 1979), has not been overturned. *But see, e.g., Keogan v. Holy Family Hosp.*, 622 P.2d 1246 (Wash. 1980); *Gustav v. Seattle Urological Assocs.*, 954 P.2d 319 (Wash. Ct. App. 1998).

and sound. We are not persuaded to alter the reasonable patient standard by analysis of the law of other states.

\* \* \* \*

¶ 198. In conclusion, we affirm the decision of the court of appeals by applying the reasonable patient standard (sometimes referred to as the "prudent patient" standard), which Wisconsin has explicitly followed in informed consent cases since at least 1975.[120] The doctrine of *stare decisis* governs the present case.

¶ 199. Under the reasonable patient standard, "Wisconsin law 'requires that a physician disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis.' "[121] The reasonable patient standard requirement of disclosure "is rooted in the facts and circumstances of the particular case in which it arises."[122] The bright-line rule PIC urges is incompatible with the reasonable patient standard adopted by the legislature in Wis. Stat. § 448.30 and explained in case law.

¶ 200. "[T]he informed consent standard . . . [i]s an objective standard based on negligence principles such as reasonableness . . . ."[123] Thus, the physician's "duty to inform is not boundless."[124]

---

[120] *See Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis. 2d 1, 227 N.W.2d 647 (1975).

[121] *Kuklinski,* 203 Wis. 2d at 329 (quoting *Martin,* 192 Wis. 2d at 175). *See also Bubb,* 321 Wis. 2d 1, ¶ 62.

[122] *Johnson,* 199 Wis. 2d at 639.

[123] *Bubb,* 321 Wis. 2d 1, ¶ 54 (citing *Scaria,* 68 Wis. 2d at 11).

[124] *Id.,* ¶ 54 (citing *Scaria,* 68 Wis. 2d at 11).

¶ 201. Applying the reasonable patient standard to the facts and circumstances of the present case involving a non-negligent diagnosis of Bell's palsy, we conclude that the circuit court could not determine, as a matter of law, that the physician had no duty to inform the patient of the possibility that the cause of his symptoms might be a blocked artery, which posed imminent, life-threatening risks, and of the availability of alternative, non-invasive means of ruling out or confirming the source of his symptoms.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 202. DAVID T. PROSSER, J. (*concurring*). This case has important ramifications for the practice of medicine in Wisconsin. The facts are not difficult to understand, but the "duties" that arise from those facts (and the way those duties are analyzed and stated) present critical policy questions for the court and society. I concur in the decision to affirm the court of appeals and the circuit court, but I am unable to join the lead opinion.

## BACKGROUND

¶ 203. On June 13, 2003, Thomas W. Jandre (Jandre), then 48, was working as a heavy equipment operator for a construction/excavation company. On his way to a job site, he drank some coffee and it came out through his nose. He began to drool, his speech was slurred, and the left side of his face was drooping. He was unsteady, dizzy, and his legs felt weak. Co-workers transported Jandre to St. Joseph's Hospital in West Bend where he had trouble walking up the curb and needed help to get to the emergency room. The obser-

vations of Jandre's co-workers and of an emergency room nurse were recorded in Jandre's chart.

¶ 204. The emergency room physician was Dr. Therese Bullis. As carefully explained by the lead opinion, Dr. Bullis examined Jandre and took appropriate steps to come to a differential diagnosis including "Bell's Palsy, stroke, TIA [transient ischemic attack], all of those stroke syndromes including ischemic as well as hemorrhagic, tumors, syndromes like—things like Guillain-Barre, MS [multiple sclerosis], and multiple other things like that." Lead op., ¶ 41.

¶ 205. The lead opinion describes the different possible causes listed in the differential diagnosis and explains what Dr. Bullis did and did not do to reach a final diagnosis. Lead op., ¶¶ 42–49.

¶ 206. A parallel discussion is provided by the court of appeals:

> Dr. Bullis testified that she observed left-side facial weakness and mild slurred speech. She made a differential diagnosis—which she testified was a "list" of what she was "evaluating the patient for"—of some kind of stroke or Bell's palsy.
>
> The testimony at trial established that there are two types of stroke: (1) ischemic, during which the blood supply to the brain is cut off, most commonly due to blockage in the carotid artery in the neck, and (2) hemorrhagic, during which there is bleeding in the tissue of the brain. There are also two types of temporary blockages, or "mini-strokes," a transient ischemic accident ("TIA") and a reversible ischemic neurological deficit ("RIND"), both of which are warning signs of a "full blown" stroke, which can cause death or permanent injury. A TIA is temporary and does not usually result in long term damage. A RIND is similar to a TIA but lasts more than twenty-four hours. Dr. Bullis ordered a CT scan for Jandre, which can determine

whether a patient suffered from a hemorrhagic stroke, a brain bleed or a tumor. The results of the CT scan were normal. Dr. Bullis conceded that the CT scan would not detect an ischemic stroke. Although there is a test to determine whether a patient suffered an ischemic stroke—a carotid ultrasound, which was available at St. Joseph's Hospital—Dr. Bullis did not order one.

The trial testimony also established that Bell's palsy is an inflammation of the seventh cranial nerve, which is responsible for facial movement. It is not life-threatening, and the majority of people who suffer from Bell's palsy recover after several weeks or months without any further symptoms. There is no test for Bell's palsy. It is diagnosed by ruling out everything else.

*Jandre v. Physicians Ins. Co. of Wis.*, 2010 WI App 136, ¶¶ 6–8, 330 Wis. 2d 50, 792 N.W.2d 558.

¶ 207. By ordering a CT scan, Dr. Bullis eliminated hemorrhagic stroke and brain tumor as possible causes of Jandre's distressed condition. Lead op., ¶ 43. By listening to Jandre's carotid arteries with a stethoscope, she may have reduced the odds that an ischemic stroke event should be her final diagnosis. *See id.*, ¶¶ 44–45. However, neither of these procedures could establish that Jandre was suffering from Bell's palsy, or eliminate the possibility that he had suffered an ischemic stroke event. Under the circumstances, in settling on Bell's palsy as her final diagnosis, the emergency room physician failed to eliminate a far more serious possible cause of Jandre's condition.

¶ 208. It is hard to dispute that a reasonable person under the circumstances confronting Jandre would want to know the possibility that he had suffered some kind of stroke—and that a non-invasive diagnostic technique (a carotid ultrasound) was available at the hospital to confirm or eliminate that possibility. It also is hard to imagine a physician providing this explana-

tion to a patient and then not recommending the carotid ultrasound procedure.

¶ 209. The informed consent statute reads in part: "Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of those treatments." Wis. Stat. § 448.30. The statute was interpreted by this court in *Martin v. Richards*, 192 Wis. 2d 156, 176, 531 N.W.2d 70 (1995), as follows:

> The applicable statutory standard in informed consent cases in Wisconsin which is explicitly stated in *Scaria [v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975)] and subsequently codified in sec. 448.30, Stats., is this: given the circumstances of the case, what would a reasonable person in the patient's position want to know in order to make an intelligent decision with respect to the choices of treatment *or diagnosis?*

*Id.* (emphasis added).

¶ 210. The *Martin* case repeatedly referred to diagnosis as well as treatment. That is why this court in *Bubb v. Brusky*, 2009 WI 91, ¶ 3, 321 Wis. 2d 1, 768 N.W.2d 903, concluded that "Wis. Stat. § 448.30 requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, *including diagnosis,* as well as the benefits and risks of such treatments." *Id.* (emphasis added).

¶ 211. In 2001, long before *Bubb* was decided by this court, the Wisconsin Civil Jury Instructions Committee produced an instruction (Wis JI—Civil 1023.2, Professional Negligence: Medical: Informed Consent) which read in part:

A doctor has the duty to provide (his) (her) patient with information necessary to enable the patient to make an informed decision about a (diagnostic) (treatment) (procedure) and alternative choices of (diagnostic) (treatments) (procedures). If the doctor fails to perform this duty, (he) (she) is negligent.

To meet this duty to inform (his) (her) patient, the doctor must provide (his) (her) patient with the information a reasonable person in the patient's position would regard as significant when deciding to accept or reject (a) (the) medical (diagnostic) (treatment) ( procedure). In answering this question, you should determine what a reasonable person in the patient's position would want to know in consenting to or rejecting a medical (diagnostic) (treatment) (procedure).

The doctor must inform the patient whether (a) (the) (diagnostic) (treatment) (procedure) is ordinarily performed in the circumstances confronting the patient, whether alternate (treatments) (procedures) approved by the medical profession are available, what the outlook is for success or failure of each alternate (treatment) (procedure), and the benefits and risks inherent in each alternate (treatment) (procedure).

. . . .

[If (doctor) offers to you an explanation as to why (he) (she) did not provide information to (plaintiff), and if this explanation satisfies you that a reasonable person in (plaintiff)'s position would not have wanted to know that information, then (*doctor*) was not negligent.]

Wis JI—Civil 1023.2 clearly includes diagnosis in its formulation.

¶ 212. The circuit court faithfully followed this instruction in the present case. Thereafter, the jury returned a verdict in favor of the Jandres on the informed consent claim.

116

## DISCUSSION

¶ 213. "Appellate courts in Wisconsin will sustain a jury verdict if there is any credible evidence to support it." *Morden v. Cont'l AG,* 2000 WI 51, ¶ 38, 235 Wis. 2d 325, 611 N.W.2d 659. "[I]f there is any credible evidence, under any reasonable view, that leads to an inference supporting the jury's finding, we will not overturn that finding." *Id.* We will "search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not." *Id.,* ¶ 39. We will uphold the jury's verdict even though the evidence is contradicted and the contradictory evidence is stronger and more convincing to us than the evidence that supports the verdict. *Id.; Weiss v. United Fire & Cas. Co.,* 197 Wis. 2d 365, 390, 541 N.W.2d 753 (1995).

¶ 214. In this case, there is ample evidence to support the verdict. To reverse the decision of the court of appeals would require us to overrule or withdraw language from past cases and change the law. Such action is not warranted on the facts presented.

¶ 215. Having determined that this court should affirm the decision of the court of appeals, I nonetheless acknowledge that I share some of the concerns articulated by Justice Roggensack in her dissent and by Judge Ralph Adam Fine in his concurring opinion in the court of appeals. *Jandre,* 330 Wis. 2d 50, ¶¶ 44–49 (Fine, J., concurring). These concerns are that the law of informed consent is being expanded beyond its original scope and purpose, with profound consequences for the practice of medicine.

### A

¶ 216. There has been a dramatic evolution in informed consent theory in the last half-century. This

117

history is briefly chronicled in *Martin,* 192 Wis. 2d at 169–76. *See also Bubb,* 321 Wis. 2d 1, ¶¶ 47–56.

¶ 217. Initially, "informed consent was based upon the tort of battery. When a patient failed to authorize treatment or consented to one form of treatment and the physician performed a substantially different treatment, the patient had a cause of action for battery." *Martin,* 192 Wis. 2d at 170.

¶ 218. Over time, "the basis for liability in informed consent cases changed to a negligence theory of liability: a physician's failure to obtain a patient's informed consent is a breach of a professionally-defined duty to treat a patient with due care." *Id.,* at 171.

¶ 219. There are several key words and phrases in the above-quoted sentence: (1) "negligence," (2) "informed consent," (3) "professionally-defined duty," and (4) "treat."

¶ 220. "Negligence" and "professionally-defined duty" are closely linked in the traditional medical malpractice case. A physician is required to conform to the accepted standard of reasonable care. The court has stated that a qualified medical practitioner, "be he a general practitioner or a specialist, should be subject to liability in an action for negligence if he fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Shier v. Freedman,* 58 Wis. 2d 269, 283–84, 206 N.W.2d 166 (1973).

¶ 221. Significantly, expert testimony is almost always needed to support a finding of negligence in a medical malpractice case. *Kuehnemann v. Boyd,* 193 Wis. 588, 592, 214 N.W. 326 (1927), *overruled in part on other grounds by Fehrman v. Smirl,* 20 Wis. 2d 1, 121 N.W.2d 251 (1963). "Without such testimony the jury

has no standard which enables it to determine whether the defendant failed to exercise the degree of care and skill required of him." *Id.; Francois v. Mokrohisky,* 67 Wis. 2d 196, 197–98, 226 N.W.2d 470 (1975); *Zintek v. Perchik,* 163 Wis. 2d 439, 455, 471 N.W.2d 522 (Ct. App. 1991).

¶ 222. The "negligence" standard in informed consent cases in Wisconsin is very different. The physician's "duty" is not defined by professionals; it is defined by a jury determination of what a reasonable person in the patient's position would want to know. The role of expert testimony in this exercise is not clear.[1]

¶ 223. In the landmark case of *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972), which has often been lauded by this court, the need for expert testimony in informed consent was addressed as follows:

> The guiding consideration our decisions distill, . . . is that medical facts are for medical experts and other facts are for any witnesses—expert or not—having sufficient knowledge and capacity to testify to them. It is evident that many of the issues typically involved in nondisclosure cases do not reside peculiarly within the medical domain. Lay witness testimony can competently establish a physician's failure to disclose particu-

---

[1] In this case, the plaintiff's standard of care expert, Dr. Zun, testified regarding the alternate diagnostic procedures Dr. Bullis ought to have discussed with Jandre under Wisconsin's informed consent statute. Even under the *Canterbury* decision, discussed *infra,* expert testimony would seem to be required in cases where an individual was injured because he or she was *not* informed of an alternate diagnostic procedure, which would have discovered the true illness that was affecting the patient. The roles of alternate diagnostic procedures to assess a given condition would seem to be medical facts beyond the comprehension of lay jurors. *Canterbury v. Spence,* 464 F.2d 772 (D.C. Cir. 1972).

119

lar risk information, the patient's lack of knowledge of the risk, and the adverse consequences following the treatment. *Experts are unnecessary to a showing of the materiality of a risk to a patient's decision on treatment, or to the reasonably, expectable effect of risk disclosure on the decision.* These conspicuous examples of permissible uses of nonexpert testimony illustrate the relative freedom of broad areas of the legal problem of risk nondisclosure from the demands for expert testimony that shackle plaintiffs' other types of medical malpractice litigation.

*Id.* at 792 (emphasis added) (footnotes omitted).

¶ 224.　The *Martin* case traces the history of moving away from a "professionally-defined duty." The court said: "Courts are split on how to apply a negligence theory to informed consent cases . . . differing on what constitutes 'sufficient information' for purposes of disclosure. Many courts only require disclosure of information that the patient can prove is customarily disclosed by other medical professionals." *Martin,* 192 Wis. 2d at 171 (citation omitted).

¶ 225.　The court then noted that *Canterbury* took a different tack, concluding that a professional standard "was inconsistent with patients' rights to make their own health care decisions." *Id.* at 171. "Therefore, a growing number of courts require physicians to disclose what a reasonable person in the patient's position would want to know." *Id.* at 172.

¶ 226.　In *Scaria,* this court adopted "the standard expounded in *Canterbury." Martin,* 192 Wis. 2d at 173. The *Scaria* court rejected a trial court's instruction that limited a doctor's disclosures to "those disclosures which physicians and surgeons of good standing would make under the same or similar circumstances, having due regard to the patient's physical, mental and emo-

tional condition." *Scaria,* 68 Wis. 2d at 12 (quotation marks omitted). The *Scaria* court explained its decision as follows:

> We are not dealing primarily with the professional competence nor the quality of the services rendered by a doctor in his diagnosis or treatment. *The right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure.* Because of the patient's lack of professional knowledge, he cannot make a rational reasonable judgment unless he has been reasonably informed by the doctor of the inherent and potential risks. The right of the patient and the duty of the doctor are standards recognized and circumscribed by the law and are not entirely dependent upon the customs of a profession. . . . *[T]he duty to disclose or inform cannot be summarily limited to a professional standard* that may be nonexistent or inadequate to meet the informational needs of a patient.

*Id.* (emphasis added).

¶ 227. *Scaria* was not a unanimous opinion. Justice Robert W. Hansen, joined by Justice Leo B. Hanley, dissented. Justice Hansen observed that a physician's duty to make reasonable disclosure is "correctly stated . . . in terms of a duty on the part of the doctor, not a right or expectation on the part of the patient." *Scaria,* 68 Wis. 2d at 22–23 (R. Hansen, J., dissenting). Justice Hansen added:

> If the standards of the profession are adequate as to the duty of a brain surgeon in diagnosis, treatment and surgical procedures, they ought be equally adequate as to what ought be disclosed as to nature of the surgery and collateral risks involved. . . . The writer has more confidence in the standards of the professional group involved than in court or jury deciding what disclosures need or ought be made to a patient facing the surgeon's

121

scalpel. Children play at the game of being a doctor, but judges and juries ought not.

*Id.* at 23–24.

¶ 228. Justice Hansen lost this battle, and Wisconsin law on informed consent has proceeded forward on an objective "reasonable person under the same or similar circumstances" standard ever since.

¶ 229. The court's standard makes good sense to this writer in circumstances like the circumstances in which the standard was created. For instance, in *Canterbury,* Dr. Spence, a neurosurgeon, performed a laminectomy on a 19–year-old boy without informing either the boy or his mother of the risk of paralysis incidental to the surgery. *Canterbury,* 464 F.2d at 776–77. "[E]ven years later, [the plaintiff] hobbled about on crutches, a victim of paralysis of the bowels and urinary incontinence." *Id.* at 776.

¶ 230. In *Scaria,* the plaintiff became "a paraplegic as a result of a percutaneous femoral aortogram, a radiological procedure whereby a dye is injected into the aorta through a catheter inserted in the groin so that the arteries leading to the kidneys can be visualized by the use of X rays." *Scaria,* 68 Wis. 2d at 4. There was "considerable dispute" between surgeon and patient about what the doctor told the patient about the "possible complications" of the procedure. *Id.* at 6–7.

¶ 231. These two cases are textbook examples to support the proposition that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." *Canterbury,* 464 F.2d at 780 (quoting authorities). They are very different from cases that do not involve any invasion of the body, either for treatment or for diagnosis. As the scope and application of informed consent are extended to new realms, we ought to ask whether the reasonable

122

patient standard—without any defined role for medical experts—is still always appropriate.

¶ 232. This question is underscored by Wis. Stat. § 448.02, relating to the Medical Examining Board. Subsection (3) of this statute reads in part:

> (3) Investigation; Hearing; Action.
>
> (a) The board shall investigate allegations of unprofessional conduct and negligence in treatment by persons holding a license . . . granted by the board. *An allegation that a physician has violated s. . . . 448.30 . . . is an allegation of unprofessional conduct.*

Wis. Stat. § 448.02(3)(a) (emphasis added).

¶ 233. Chapter 375, Laws of 1981, which created Wis. Stat. § 448.30 (the informed consent statute), also amended § 448.02 to add the important sentence: "An allegation that a physician has violated s. 448.30 is an allegation of unprofessional conduct."

¶ 234. Today, then, a physician must worry not only about his or her patient's condition but also about tort liability and professional discipline, both of which may be grounded on a jury verdict that is not tied to a professionally defined standard of care. This necessarily encourages the practice of defensive medicine. Defensive medicine is a physician's natural response to the fear of strict liability.

¶ 235. Under these circumstances, I believe it is fair to ask whether this court's opinions in informed consent cases serve to prevent strict liability in fact or perception, or whether they have the opposite effect at great cost to health care in Wisconsin.

B

¶ 236. Another of the key terms in the sentence quoted in ¶ 17, *supra,* is the word "treat."

¶ 237. "Treat" is not a defined term. This undefined term appears six times in different forms in Wis. Stat. § 448.30.

¶ 238. The title reads: "Information on alternate modes of *treatment.*"

¶ 239. The first sentence reads: "Any physician who *treats* a patient shall inform the patient about the availability of all alternate, viable medical modes of *treatment* and about the benefits and risks of these *treatments.*" Wis. Stat. § 448.30.

¶ 240. Subsection (5), one of the exceptions to the general rule, reads: "Information in emergencies where failure to provide *treatment* would be more harmful to the patient than *treatment.*" Wis. Stat. § 448.30(5).

¶ 241. The *Bubb* court concluded that Wis. Stat. § 448.30 "requires any physician who treats a patient to inform the patient about the availability of all alternate, viable medical modes of treatment, *including diagnosis,* as well as the benefits and risks of such treatments." *Bubb,* 321 Wis. 2d 1, ¶ 78 (emphasis added).

¶ 242. The phrase "including diagnosis" was based on language in *Martin.* Moreover, the aortogram described in *Scaria* was an invasive *diagnostic* procedure that was intended "to determine whether there was a narrowing of the arteries leading to the kidneys that might be causing the high blood pressure." *Scaria,* 68 Wis. 2d at 5.

¶ 243. Especially in an emergency room, it would be difficult to draw a line between diagnostic procedures and treatment, and it would be illogical to distinguish among *invasive* procedures under the statute— including many but excluding others on the sole basis that they were diagnostic.

¶ 244. President George W. Bush recently observed (in a much broader context) that: "You cannot solve a problem until you diagnose it."[2] Most people who go to an emergency room expect health care providers to diagnose their problem so that they can proceed to address it. The phrase "including diagnosis" in *Bubb* envisions "diagnosis" as a form of treatment.

¶ 245. Nevertheless, the statute appears to distinguish treatment from diagnosis.[3] Once diagnosis is determined to come within treatment, we are likely to be confronted with an endless variety of choices and options, some of which will entail no bodily invasion whatsoever. Many states appear not to embrace diagnosis in their informed consent statutes or cases for this very reason.

¶ 246. Inasmuch as the court has determined that "treatment" includes diagnosis, it becomes imperative for policy makers to fashion reasonable limits to that term and to the duty imposed by statute upon Wisconsin's physicians.

[2] George W. Bush, *Decision Points* 274 (2010).

[3] Wisconsin Stat. § 448.30 is derived from 1981 Assembly Bill 941 introduced by Rep. Betty Jo Nelsen. The analysis of the bill prepared by the Legislative Reference Bureau reads in part:

In *Scaria v. St. Paul Marine and Fire Insurance Co.*, 68 Wis. 2d 1 (1975), the Wisconsin supreme court has stated that a physician has a duty to make disclosures to a patient that appear reasonably necessary under the existing circumstances to enable a reasonable person intelligently to exercise the right to consent or refuse treatment. A physician can be guilty of malpractice if failure to make these disclosures is causally related to a patient's injury. The court stated that a causal relation exists if a prudent person would have decided against the treatment had the person been informed of the risks involved and alternatives available.

Drafting file, 1981 A.B. 941, Legislative Reference Bureau, Madison, Wis.

¶ 247. The other word in the sentence quoted in ¶ 218, *supra,* that deserves examination is "consent," which is contained in the phrase "informed consent."

¶ 248. When it is used as a noun, "consent" has a well-established meaning. *The American Heritage Dictionary of the English Language* 401 (3d ed. 1992) defines the noun "consent" as "1. Acceptance or approval of what is planned or done by another; acquiescence. See Synonyms at *permission.* 2. Agreement as to opinion or a course of action."

¶ 249. Neither "consent" nor "informed consent" is part of Wis. Stat. § 448.30. However, informed consent to treatment is a central policy objective of the relevant cases and statutes. "The right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure." *Scaria,* 68 Wis. 2d at 12.

¶ 250. *Canterbury* expanded this concept when it proclaimed the "patient's right of self-determination on particular therapy." *Canterbury,* 464 F.2d at 784. *Martin,* in turn, translated *Canterbury* to mean that "every human being has a right to make his or her own medical decisions." *Martin,* 192 Wis. 2d at 172.

¶ 251. The case before us appears to represent an even greater expansion of a patient's rights: a patient shall be given sufficient information about the availability of all alternate, viable medical modes of treatment (or diagnosis) so that the patient may not only reject a recommended mode of treatment or diagnosis but also select a different one. If this statement is correct, the right described goes well beyond any recognized definition of "consent."

¶ 252. An amicus brief filed by the Wisconsin Medical Society, et al., complains that under the court of appeals' interpretation of the statute, which this court affirms:

Physicians would effectively be required to tell their patients "I believe in my diagnosis but if my diagnosis is wrong, here are all the other things you should consider." No other area of human interaction embraces the proposition that a professional must give a layperson the choice of usurping their professional judgment. There is no practical guidance on how to meet this obligation.

¶ 253. Another amicus, Dean Health System Inc., et al., asserts that Wis. Stat. § 448.30 "does not require —and should not be expanded to require—that the patient be allowed to select from an extensive list of procedures on demand."

¶ 254. I have already stated that this court's informed consent jurisprudence may promote the practice of defensive medicine. The abandonment of the limitations of "consent" has a corresponding impact on patients. If a physician does not practice defensive medicine, his patient is empowered to make his or her own medical decisions, selecting modes of treatment or diagnosis pro se, potentially at great cost to the health care system.

¶ 255. These concerns must be addressed and answered more effectively than anything written in this opinion.

D

¶ 256. The lead opinion provides a trenchant argument for affirmance and for the current direction of

Wisconsin law. I am unable to join the opinion because of the reservations I have about the direction we are going.

¶ 257. Chapter 375, Laws of 1981, includes a provision requiring the Medical Examining Board to "adopt rules to implement s. 448.30." That requirement is presently embodied in Wis. Stat. § 448.40(2)(a).

¶ 258. The Board promulgated rules in 1983. *See* Wis. Admin. Code ch. Med. 18 Alternative Modes of Treatment (Dec. 1999).

¶ 259. Nearly three decades have passed since the adoption of Wis. Stat. § 448.30 and the rules implementing the statute. Much has changed in the intervening years. Perhaps the time has come for a thorough review of the rules by a blue ribbon committee, including but not limited to medical professionals, so that physicians are given clear guidance as to their obligations under this statute.

¶ 260. A blue ribbon committee would be better equipped to wrestle with the serious policy questions raised here than an individual justice.

¶ 261. For the foregoing reasons, I respectfully concur.

¶ 262. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). I write in dissent because the lead opinion, when combined with Justice Prosser's concurrence that affirms the court of appeals decision, holds a physician strictly liable for a missed diagnosis, contrary to the legislative directive in Wis. Stat. § 448.30 and our long-standing precedent.[1] I also write in dissent to

---

[1] Justice Ann Walsh Bradley and Justice N. Patrick Crooks join Chief Justice Shirley S. Abrahamson's lead opinion. Justice David T. Prosser does not join the lead opinion, but he does

point out that if the lead opinion had garnered the vote of four justices for its reasoning, which it did not, the court would have imposed strict liability for missed diagnoses by expanding a patient's right of informed consent under § 448.30 from a right to be informed about the risks and benefits of treatments and procedures that *were recommended* by the physician into a right to be informed about all treatments and procedures that *were not recommended* by the physician, but which may be relevant to whether the correct diagnosis was made. Stated otherwise, the lead opinion's attempted expansion of § 448.30 would require that whenever there is a claim that the correct diagnosis of a patient's ailment was not made, a physician would be liable for failing to tell a patient about all potential diagnoses and all potential tests that could have been employed to evaluate whether different ailments were the source of the patient's symptoms. This would be an entirely new concept that the legislature did not codify when it enacted § 448.30. Accordingly, I conclude that § 448.30 is not implicated in this malpractice action because there was no failure to inform the patient about the risks and benefits of the treatment and procedures that the physician employed.

¶ 263. I also conclude that under the circumstances presented the jury's finding that Dr. Bullis was not negligent in her care and treatment of Thomas Jandre is inconsistent with the jury's finding that Dr. Bullis was negligent in regard to her duty to obtain informed consent. Accordingly, I would reverse the decision of the court of appeals, and due to the incon-

---

affirm the court of appeals decision based on a theory different from that set out in the lead opinion. Justice Annette Kingsland Ziegler and Justice Michael J. Gableman join Justice Patience Drake Roggensack's dissenting opinion.

sistency in the jury's verdicts, I would remand for a new trial on whether Dr. Bullis was negligent in her care and treatment of Mr. Jandre. Therefore, I respectfully dissent.

## I. BACKGROUND

¶ 264. On June 13, 2003, Mr. Jandre drank some coffee and it came out his nose. He also began to drool, suffered from slurred speech and his face drooped on the left side. He felt dizzy, unsteady and had weakness in both legs. His co-workers took him to the St. Joseph's Hospital West Bend emergency room. Mr. Jandre related his symptoms to Dr. Bullis, who was on duty as the emergency room physician when he arrived. Mr. Jandre's co-workers also explained to Dr. Bullis what they had seen. Dr. Bullis made a differential diagnosis, which is a list of ailments from which the patient could be suffering in order of probability. Her differential diagnosis included Bell's palsy, stroke, transient ischemic attack (TIA), tumor, Guillain-Barre and Multiple Sclerosis.

¶ 265. Dr. Bullis pursued various diagnostic procedures to determine the ailment that was causing Mr. Jandre's symptoms. She examined Mr. Jandre's carotid arteries by listening for bruits, which develop when there is blockage in the carotid arteries. Blockage of the carotid arteries may cause an ischemic stroke[2] or a TIA. She heard no bruits. She ordered a CT (computerized tomography) scan to rule out hemorrhagic stroke.[3] The CT scan was normal. None of the procedures recommended by Dr. Bullis caused injury to Mr. Jandre.

---

[2] Ischemic stroke results from the brain receiving too little oxygen due to poor intracranial circulation.

[3] Hemorrhagic stroke results when there is an intracranial bleed.

¶ 266. After all the tests were completed, Dr. Bullis determined that Mr. Jandre was suffering from a mild form of Bell's palsy. She concluded that he had not experienced a hemorrhagic stroke, based on the CT scan, and had not experienced an ischemic stroke or a TIA, based on the lack of bruits in his carotid arteries. Upon reaching her diagnosis of Bell's palsy, Dr. Bullis informed Mr. Jandre about what he might expect from Bell's palsy. As treatment, she prescribed medications consistent with the diagnosis of Bell's palsy. None of the medications prescribed by Dr. Bullis caused injury to Mr. Jandre. She also told him to go to his family doctor for a complete exam within a week, or sooner if other symptoms developed.

¶ 267. Three days after being treated for Bell's palsy and sent home from the emergency room, Mr. Jandre saw Dr. Steele, a family medicine physician. He confirmed Dr. Bullis's Bell's palsy diagnosis. Unfortunately, eight days after Mr. Jandre's visit to Dr. Steele, he suffered a significant stroke.

¶ 268. On June 14, 2004, Mr. and Mrs. Jandre filed suit against Dr. Bullis, alleging that she negligently diagnosed Mr. Jandre as having Bell's palsy, when he had initial symptoms of a stroke or a TIA. The Jandres also alleged that Dr. Bullis negligently failed to inform Mr. Jandre about the possibility of having a carotid ultrasound to diagnose whether he had a blocked carotid artery that had caused a TIA or stroke.

¶ 269. When the matter went to trial, Dr. Bullis objected to Mr. Jandre's informed consent claim and to the jury instructions that described an informed consent claim. The jury found that Dr. Bullis was not negligent in her diagnosis of Mr. Jandre's ailment, but that she was negligent in fulfilling her duty to obtain informed consent. Subsequent to the jury verdict, Dr.

Bullis again objected to the informed consent claim, requesting a new trial because the verdict was contrary to Wisconsin's informed consent law. All of her motions and objections in regard to informed consent were denied. The court of appeals affirmed the decision of the circuit court. *Jandre v. Physicians Ins. Co. of Wis.,* 2010 WI App 136, ¶¶ 2–3, 330 Wis. 2d 50, 792 N.W.2d 558.

¶ 270. In affirming the court of appeals decision, the lead opinion attempts to significantly expand the obligations of physicians under Wis. Stat. § 448.30. The lead opinion opines that "the circuit court could not determine, as a matter of law, that the physician had no duty to inform the patient of the possibility that the cause of his symptoms might be a blocked artery, which posed imminent, life-threatening risks, and of the availability of alternative, non-invasive means of ruling out or confirming the source of his symptoms."[4] This reasoning would place a duty on a physician to inform his or her patients about medical treatments and procedures that the physician is not recommending solely because such treatments and procedures may be relevant to whether the physician's diagnosis was correct.

## II. DISCUSSION

### A. Standard of Review

¶ 271. Statutory construction and application present questions of law for our independent review. *Richards v. Badger Mut. Ins. Co.,* 2008 WI 52, ¶ 14, 309 Wis. 2d 541, 749 N.W.2d 581. However, as we conduct our review, we benefit from prior analyses of the court of appeals and the circuit court. *Id.*

¶ 272. This case also requires us to consider the jury's verdicts on two separate claims based on the same

---

[4] Lead op., ¶ 10.

factual occurrence. On one of the claims, the jury found that Dr. Bullis was not negligent and on the other, the jury found she was negligent. We examine the jury verdicts on the two separate claims to determine whether the jury's findings are inconsistent as a matter of law. *Westfall v. Kottke,* 110 Wis. 2d 86, 94, 328 N.W.2d 481 (1983).

## B. Informed Consent

¶ 273. A physician's duty of informed consent is set forth in Wis. Stat. § 448.30. Section 448.30 provides:

> Information on alternate modes of treatment. Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:

> (1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.

> (2) Detailed technical information that in all probability a patient would not understand.

> (3) Risks apparent or known to the patient.

> (4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.

> (5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

> (6) Information in cases where the patient is incapable of consenting.

¶ 274. Statutory interpretation always "begins with the language of the statute." *Richards,* 309 Wis. 2d

541, ¶ 20 (internal quotation marks and citation omitted). We assume that the meaning of the statute is expressed in the words that the legislature chose to use. *Id.* The context in which statutory terms are considered is helpful to our understanding. *Id.* When the statutory language is unambiguous, we apply the plain, clear meaning of the statute. *Id.*

¶ 275. Accordingly, I begin with the plain meaning of the words that the legislature chose, and then examine *Scaria v. St. Paul Fire & Marine Insurance Co.,* 68 Wis. 2d 1, 227 N.W.2d 647 (1975), because all parties agree that Wis. Stat. § 448.30 is the codification of our decision in *Scaria. See Johnson v. Kokemoor,* 199 Wis. 2d 615, 629–30, 545 N.W.2d 495 (1996) (concluding that § 448.30 is the codification of *Scaria*).

¶ 276. The plain language of Wis. Stat. § 448.30 speaks only to "modes of treatment" and the "benefits and risks of these treatments." It requires the physician to provide the patient with enough information to permit the patient to choose whether to undergo a recommended treatment or not, if that choice is possible for the patient to make. The entire focus of § 448.30 is on *something that a physician is recommending to be done to the patient.* Obtaining a patient's informed consent to treatment or procedures that the physician is not recommending as part of his diagnosis and treatment of the patient is not within the plain meaning of § 448.30. Further, such an expansion of the duty of informed consent is not a concept found in *Scaria,* upon which the legislature based § 448.30.

¶ 277. In *Scaria,* the medical malpractice action involved two claims: a claim of negligent care and treatment and a claim of failure to obtain informed consent to a procedure that Mr. Scaria underwent based upon the recommendation of his physician. These medi-

cal claims both arose out of the same procedure that caused Mr. Scaria to become a paraplegic. The procedure he underwent was a percutaneous femoral aortogram, recommended by the physician to determine why Mr. Scaria had elevated blood pressure. The percutaneous femoral aortogram involved the injection of dye into Mr. Scaria's artery in order to study his kidneys. Mr. Scaria had a severe reaction to the dye, which he alleged was a risk of the recommended procedure that was not explained to him. *Scaria,* 68 Wis. 2d at 4. At trial, the jury was asked to evaluate Mr. Scaria's informed consent claim under the following parameters:

> a physician and surgeon has a duty to make reasonable disclosure to his patient of all significant facts under the circumstances of the situation which are necessary to form the basis of an intelligent and informed consent by the patient to the proposed treatment or operation and the patient must have given such consent to the treatment or operation. This duty, however, is limited to those disclosures which physicians and surgeons of good standing would make under the same or similar circumstances, having due regard to the patient's physical, mental and emotional condition.

*Id.* at 10.

¶ 278. Mr. Scaria objected to that part of the jury instruction that limited the physician's duty to only those disclosures that reasonable physicians would make under similar circumstances. *Id.* at 10–11. We agreed that Mr. Scaria was correct in that the limitation set out by the circuit court was not appropriate for an informed consent claim. We stated "[t]he *right* to be recognized and protected is the right of the patient *to consent or not to consent to a proposed medical treatment or procedure." Id.* at 12 (emphasis added).

135

¶ 279. However, in *Scaria,* we also recognized that the obligation to provide information of the risks of a proposed medical treatment or procedure was not without limitation. We explained:

> [a] doctor should not be required to give a detailed technical medical explanation that in all probability the patient would not understand. He should not be required to discuss risks that are apparent or known to the patient. Nor should he be required to disclose extremely remote possibilities that at least in some instances might only serve to falsely or detrimentally alarm the particular patient. Likewise, a doctor's duty to inform is further limited in cases of emergency or where the patient is a child, mentally incompetent or a person is emotionally distraught or susceptible to unreasonable fears.

*Id.* at 12–13 (footnote omitted). We then summarized our holding as, "the duty of the doctor is to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to *intelligently exercise his right to consent or to refuse the treatment or procedure proposed.*" *Id.* at 13 (emphasis added).

¶ 280. *Scaria*'s requirement that informed consent be obtained for any treatment or procedure that is recommended to be performed on a patient is supported by an earlier case, *Trogun v. Fruchtman,* 58 Wis. 2d 569, 207 N.W.2d 297 (1973). In *Trogun,* we first explained a change in medical malpractice theory such that:

> where the alleged misconduct on the part of the physician amounts to a failure to disclose the ramifications of a pending course of treatment, therapy, or surgery . . . we conclude it is preferable to affirmatively recognize a

136

legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged the patient-plaintiff was not informed adequately of the ramifications of a course of treatment.

*Id.* at 598–600.

¶ 281. Prior to *Trogun,* the law of medical malpractice had been grounded in assault and battery law, and *Trogun* was an early decision recognizing that informed consent claims do not readily fit within that parameter. Therefore, *Scaria,* grounded in the reasoning of *Trogun,* focused on disclosing to the patient the risks of a course of treatment or a procedure, *i.e.* doing something to the patient that the physician recommended be done, so that the patient could make an informed decision about whether to consent to the recommended treatment or procedure. Nothing in *Trogun* or *Scaria* could be read as imposing a duty on a physician to obtain the patient's consent to a treatment or procedure that the physician had not recommended.

¶ 282. We also addressed the duty of informed consent in *Martin v. Richards,* 192 Wis. 2d 156, 531 N.W.2d 70 (1995), where we interpreted a claim of failure to obtain informed consent to treatment that was recommended for a child. In order to be understood, *Martin* must be considered in the circumstances under which it arose. There, 14–year-old Cheryl Martin "ran into the back of a truck while riding her bicycle." *Id.* at 163. She was transported to the hospital emergency room at approximately 10:40 p.m. *Id.*

¶ 283. Dr. Richards was on duty in the emergency room that evening. He examined Ms. Martin when she came in and also an hour later. *Id.* He had been told that she was injured when she hit the back of a dump truck while riding her bicycle and that she had been unconscious at the scene for an undetermined period of time.

*Id.* He was also told that she had vomited five or six times and some amnesia was observed. *Id.* at 163–64. There was swelling and bruising to the right zygomatic area of her head, an area where intracranial bleeding may occur if a cranial artery is torn. *Id.* at 164.

¶ 284. Dr. Richards' differential diagnosis was "concussion, contusion, and the possibility of intracranial bleeding." *Id.* at 164 (internal quotation marks omitted). Given that diagnosis, Dr. Richards explained to her father that he could send her home for Mr. Martin to watch over or he could admit her to the hospital for observation. *Id.* Dr. Richards believed that Ms. Martin should remain at the hospital for continued observation, and he convinced her father to accept that treatment. *Id.* However, Dr. Richards did not advise Mr. Martin that if Ms. Martin were to incur subsequent intracranial bleeding, which was one of the risks Dr. Richards knew was present, that Ms. Martin could not be treated for that consequence of her head injury because the hospital had no neurosurgeon. *Id.*

¶ 285. Ms. Martin was admitted to the hospital and did incur a subsequent intracranial bleed, whereupon she was transferred to the University of Wisconsin Hospital. Unfortunately, the necessary neurosurgery was not performed until 3:55 a.m. and she suffered severe and permanent injuries. *Id.* at 165. The Martins brought a malpractice action alleging that Dr. Richards was negligent in his treatment of Ms. Martin; that the care provided by the nursing staff was negligent in not observing Ms. Martin more closely; and that Dr. Richards did not inform Ms. Martin's father about the risks of his recommended treatment that she remain at the hospital when the hospital had no neurosurgeon to treat the known risk of an intracranial bleed. *Id.* at 165–66.

¶ 286. The jury determined that Dr. Richards was not negligent in either his diagnosis or treatment of Ms. Martin. *Id.* at 166. The jury did conclude that the nurses were negligent in failing to monitor Ms. Martin's condition more closely, but that their negligence was not a cause of Ms. Martin's injury. *Id.* The jury also found that Dr. Richards negligently failed to inform Mr. Martin of alternate forms of treatment for the head injury Ms. Martin had sustained. *Id.* The alternate treatment would have involved moving Ms. Martin to a hospital that had a neurosurgeon to operate if intracranial bleeding occurred. *See id.* The circuit court dismissed the informed consent claim notwithstanding the verdict, and the court of appeals reversed. *Id.*

¶ 287. When we reviewed the claim brought by Ms. Martin under Wis. Stat. § 448.30, we concluded "that statute's operative language [was]: 'Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments.' " *Id.* at 169. We explained that the difficulty in interpreting the statute was determining "what is considered an alternate, viable mode of treatment." *Id.*

¶ 288. We determined the scope of the statute by examining the development of the doctrine of informed consent and the codification of informed consent set out in Wis. Stat. § 448.30. *Id.* We opined that "[c]onsent to treatment is [meaningful] only if it is given by persons informed or knowledgeable about the various choices available and the risks attendant upon each." *Id.* at 169–70. We reasoned that in *Scaria,* upon which § 448.30 is based, the plaintiff's injuries resulted from complications associated with an aortogram, a diagnostic procedure. *Id.* at 175. In so doing, we explained that

139

when a physician recommends a treatment, "[t]he distinction between diagnostic and medical treatments is not in and of itself significant to an analysis of informed consent." *Id.* We continued to opine that:

> as part of the physician's duty to obtain a patient's informed *consent to any medical procedure employed by the physician* in dealing with the patient, there is a duty imposed on the physician to disclose to the patient the existence of any methods of diagnosis or treatment that would serve as feasible alternatives to the method initially selected by the physician to diagnose or treat the patient's illness or injury.

*Id.* at 175–76 (emphasis added) (citation omitted). We further explained that, "[a] physician who proposes to treat a patient or [to] attempt to diagnose a medical problem must make such disclosures as will enable a reasonable person under the circumstances confronting the patient to exercise the patient's right to consent to, or to refuse the procedure proposed or to request an alternative treatment or method of diagnosis." *Id.* at 176. Contrary to the lead opinion,[5] nothing in *Martin* suggested that a physician was required to disclose information to enable a patient to consent to a treatment or procedure that was not recommended by his physician. To do so would be tantamount to requiring the physician to obtain the patient's informed consent not to institute a treatment or procedure that the physician has decided is not appropriate given the physician's diagnosis.

¶ 289. In *Martin,* the recommended treatment for Ms. Martin's head trauma was to remain at Fort Atkinson Hospital for careful observation. However, the risk of that treatment, *i.e.,* a significant delay in surgery

---

[5] Lead op., *e.g.,* ¶¶ 8, 10, 17, 27, 38, 81, 95.

if it became necessary due to an intracranial bleed, was not explained. *Id.* at 179. We concluded that it was "not the diagnosis[] that drives the duty to inform in this case," but the consequences associated with a concussion, which included a "delayed intracranial bleed." *Id.* at 180–81.

¶ 290. When we analyze the breadth of Wis. Stat. § 448.30 as construed in *Martin,* it is important to recognize that what was being determined in *Martin* was whether information existed that should have been provided about the risk of the recommended treatment, *i.e.,* information about the risk of remaining in a hospital that had no neurosurgeon to operate on Ms. Martin if an intracranial bleed occurred. That our discussion in *Martin* was driven by the recommended treatment is shown by the special verdict:

> Question 3 . . .: Would a reasonable person in Robert Martin's position have agreed to the alternate forms of care and treatment had he been informed of their availability? (Yes or No).

*Id.* at 184.

¶ 291. In *Martin,* we did not decide that information about alternate diagnoses of the injury suffered by Ms. Martin was required by Wis. Stat. § 448.30. But rather, in affirming the jury's verdict, we said:

> [Dr. Richards] knew that Ms. Martin's condition was more serious than a simple concussion. *He knew that associated with this concussion was the possibility of a delayed intracranial bleed. It was this condition* (the excessive vomiting, the amnesia, the unconsciousness of an undetermined time, the injury to the head), *not the diagnosis,* that drives the duty to inform in this case."

*Id.* at 180–81 (emphasis added).

141

¶ 292. *Bubb v. Brusky*, 2009 WI 91, 321 Wis. 2d 1, 768 N.W.2d 903, is our most recent interpretation of informed consent under Wis. Stat. § 448.30. As with *Martin*, it must be understood in light of the circumstances in which it arose. *Bubb* arose out of Richard Bubb's initially having trouble ingesting his food and then falling out of his chair. *Id.*, ¶ 5. He was transported to the hospital emergency room, where he was seen by Dr. Brusky. *Id.*, ¶¶ 5–6. Dr. Brusky ordered a CT scan, an EKG (electrocardiogram) and blood tests to evaluate Mr. Bubb. *Id.*, ¶ 6. Mr. Bubb began to feel better and the results of the tests caused Dr. Brusky to conclude that Mr. Bubb had suffered a TIA (transient ischemic attack), which manifested itself as stroke-like symptoms. *Id.*, ¶ 7. Dr. Brusky discharged Mr. Bubb with instructions to follow up with a neurologist, Dr. Gu. *Id.*, ¶¶ 8–9. Two days later, Mr. Bubb suffered a significant stroke. *Id.*, ¶ 11.

¶ 293. In his lawsuit, Mr. Bubb did not question the correctness of Dr. Brusky's TIA diagnosis. Rather, he questioned the completeness of the information given to him about viable treatments for his TIA. *See id.*, ¶ 70. We agreed with Mr. Bubb's contention that the question presented was whether he made an informed decision when he consented to Dr. Brusky's suggested mode of treatment. The recommended treatment for Mr. Bubb's TIA was discharge from the hospital with instructions for follow-up care. The issue of informed consent arose because Mr. Bubb was not told of alternative treatment, which was admission to the hospital for further diagnostic testing, and the benefits and risks of both treatments. *Id.*, ¶ 71.

¶ 294. We concluded that there was credible evidence in the record from which a reasonable jury could conclude that Dr. Brusky did not obtain informed

consent to the treatment he recommended, and therefore, the circuit court should have submitted Mr. Bubb's informed consent claim to the jury. *Id.,* ¶ 73. Contrary to the holding of the lead opinion,[6] our decision in *Bubb* has nothing to do with a physician's obligation to obtain informed consent to procedures that the physician has not recommended and that are not consistent with the physician's diagnosis.

¶ 295. Indeed, Wis. Stat. § 448.30, *Scaria, Martin* and *Bubb* are consistent in what they require. Each requires the physician to obtain the patient's informed consent to a treatment or procedure that is being recommended to be done to the patient based on either the physician's diagnosis of the patient's ailment or in an attempt to diagnose the patient's ailment. Informed consent to the proposed treatment or procedure is obtained when the patient is told of the benefits and the risks of following the physician's advice. *Scaria,* 68 Wis. 2d at 13; *Martin,* 192 Wis. 2d at 169–70; *Bubb,* 321 Wis. 2d 1, ¶ 73.

¶ 296. *Hoven v. Kelble,* 79 Wis. 2d 444, 256 N.W.2d 379 (1977), also is an important medical malpractice case. *Hoven* involved a claim for injuries sustained as a result of a lung biopsy. *Id.* at 446. During the lung biopsy, Mr. Hoven suffered a cardiac arrest, resulting in injury to his nervous system and brain tissue that caused extensive medical expenses, pain, suffering and disability. *Id.*

¶ 297. Mr. Hoven alleged ten separately stated causes of action, three of which were predicated on the theory of strict liability for allegedly defective medical services rendered by each of the defendants. Our discussion of strict liability in *Hoven* begins by explaining

---

[6] Lead op., ¶ 121.

that "[o]ur court has held members of the medical profession to a standard of reasonable care under the circumstances." *Id.* at 456. We stated that the proper standard is reasonable care under the circumstances because " '[a] physician is not an insurer of the results of his diagnosis or procedures.' " *Id.* (internal quotation marks and citation omitted).

¶ 298. We also explained that medicine is not an exact science and the very best physicians using a reasonable degree of care and skill could not be expected never to err in regard to a diagnosis or the performance of a procedure. *Id.* We concluded our discussion in *Hoven* by establishing that under the law, "[m]edical sciences are not exact. A patient cannot consider a doctor's treatment to be defective simply because it does not cure his ailment. . . . To hold medical professionals strictly liable under these circumstances would not promote any social benefit." *Id.* at 465. The rule of law set out in *Hoven,* that a physician's duty is not based on strict liability, but rather on negligence, would be overruled sub silentio by the lead opinion if four justices had joined it. This is so because the lead opinion attempts to expand a physician's duty to explain procedures that the physician did not recommend, but which may be relevant to whether the physician's diagnosis was correctly made.

¶ 299. In the case at hand, Dr. Bullis did not contravene her duty to obtain informed consent from Mr. Jandre, as a matter of law. The treatment she recommended for Mr. Jandre, which was to see his private physician within a week, or sooner if his symptoms recurred, was consistent with her diagnosis of Bell's palsy. If her diagnosis had been correct, there were no undisclosed risks of the recommended treatment.

144

¶ 300. The lead opinion attempts to hold Dr. Bullis strictly liable for a missed diagnosis by requiring that she obtain Mr. Jandre's informed consent to forgo a carotid ultrasound, whose only relevance was to show that Dr. Bullis' diagnosis of Bell's palsy was not correct. That the lead opinion attempts to impose strict liability for a missed diagnosis becomes apparent when one examines what would have happened if the diagnosis of Bell's palsy had been correct. If that were the circumstance, the lead opinion would not conclude that Dr. Bullis violated Wis. Stat. § 448.30 for failing to tell Mr. Jandre that a carotid ultrasound could have been done to assist in ruling out a TIA or stroke.

¶ 301. The reasoning of the lead opinion is a significant change in the law, and it is not supported either by Wis. Stat. § 448.30 or *Scaria,* upon which § 448.30 is based. Stated otherwise, § 448.30 is based on informing patients of the risks and benefits of procedures that the physician *recommends be done to the patient. Scaria,* 68 Wis. 2d at 12 (concluding that "[t]he right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure"). In sharp contrast, the lead opinion is based on requiring the physician to obtain informed consent to forgo procedures that the physician *has not recommended be done to the patient,* procedures that are not consistent with the diagnosis the physician made. The potential scope of the reasoning underlying the lead opinion is breathtaking because a claim for the violation of the duty of informed consent would be limited only by an expert's theory on what might have been diagnosed.

¶ 302. The lead opinion's attempted expansion of the law to require information about procedures that may show that the physician's diagnosis was not correct is not supported by any other Wisconsin case. This is so

145

because the doctrine of informed consent arises from the "notion that an adult has a right to determine what shall be done with his own body." *Schreiber v. Physicians Ins. Co. of Wis.,* 223 Wis. 2d 417, 426, 588 N.W.2d 26 (1999) (internal quotation marks and citation omitted). If a physician has not recommended a treatment or that a procedure be done, there is no invasion of the patient's right to bodily integrity that the physician recommended.

¶ 303. I agree that a patient has the right to say what will be done with his or her body, and he or she cannot make an informed decision about that right unless the "benefits and risks" of the recommended procedures or treatments are explained to the patient. However, there is no Wisconsin case that requires a physician to explain procedures to the patient that the physician is not recommending be done. *See Trogun,* 58 Wis. 2d at 599 (explaining that "a failure to disclose the ramifications of a pending course of treatment, therapy, or surgery" was the issue in an informed consent claim); *Martin,* 192 Wis. 2d at 176 (concluding that "[a] physician who proposes to treat a patient or [to] attempt to diagnose a medical problem must make such disclosures as will enable a reasonable person under the circumstances confronting the patient to exercise the patient's right to consent to, or to refuse the procedure proposed"); *Johnson,* 199 Wis. 2d at 630 (concluding that the "concept of informed consent is based on the tenet that in order to make a rational and informed decision about undertaking a particular treatment or undergoing a particular surgical procedure, a patient has the right to know about significant potential risks involved in the proposed treatment or surgery"); *Hannemann v. Boyson,* 2005 WI 94, ¶ 44, 282 Wis. 2d 664, 698 N.W.2d 714 (explaining that medical profes-

146

sionals "are obligated to disclose and discuss the material risks of any given procedure or treatment with their patients so that their patients may make informed decisions as to whether they want to consent to bodily intrusions and proceed with the recommended procedure or treatment"); *Bubb*, 321 Wis. 2d 1, ¶ 73 (concluding that "Dr. Brusky's failure to adequately inform the Bubbs of the alternative mode of treatment available was a cause of Richard's injuries that resulted from his stroke").

¶ 304. The lead opinion requires more than information about physician-recommended treatment or procedures and their benefits and risks. The lead opinion attempts to change the duty to obtain informed consent for a physician-recommended treatment or procedure into a duty to obtain informed consent for a procedure that the physician has not recommended, solely because the procedure may show that the physician's diagnosis was not correct. The lead opinion attempts to expand Wis. Stat. § 448.30 to require the physician to inform the patient about the risks and benefits of a procedure, here a carotid ultrasound, that the physician did not recommend in regard to treating or diagnosing the ailment that the physician concluded the patient had. Rather, a carotid ultrasound has relevance only to determining whether the diagnosis of Bell's palsy was correctly made. Therefore, the lead opinion's holding, if it were adopted by four members of this court, would impose strict liability on the physician for his or her diagnosis, contrary to our holding in *Hoven. Hoven*, 79 Wis. 2d at 456.

¶ 305. The lead opinion attempts to clothe itself in precedent, as it takes statements from past cases and juxtaposes them with holdings that the statements and the cases cited do not support. For example, the lead opinion says, "Wisconsin law 'requires that a physician

147

disclose information necessary for a reasonable person to make an intelligent decision with respect to the choices of treatment or diagnosis.' "[7] Although the words are accurately quoted from *Kuklinski v. Rodriguez,* 203 Wis. 2d 324, 329, 552 N.W.2d 869 (Ct. App. 1996), *Kuklinski* did not require a physician to inform a patient of the availability of a CT scan at a time when the physician did not believe a CT scan was warranted. To the contrary, *Kuklinski* holds that there was no reason to inform the patient of the availability of a CT scan when the patient came into the emergency room because the physician's initial diagnosis of Mr. Kuklinski was that he had a "minor head injury." *Id.* at 333. That the physician later ordered a CT scan was due to a change in his diagnosis based on the patient's change in condition. *Id.* at 332–33. Neither *Kuklinski* nor any other case supports a claim that Dr. Bullis violated her duty to obtain Mr. Jandre's informed consent when she did not explain to him that a carotid ultrasound may show that her diagnosis of Bell's palsy was not correct.

## C. Inconsistent Verdicts

¶ 306. The jury found that Dr. Bullis was not negligent in her diagnosis of Bell's palsy even though she had not done a carotid ultrasound to rule out the diagnoses of TIA or stroke caused by blockage of the carotid arteries. The jury also found that Dr. Bullis was negligent in performing her duty of obtaining informed consent because she did not tell Mr. Jandre that a

---

[7] Lead op., ¶ 8, quoting *Kuklinski v. Rodriguez,* 203 Wis. 2d 324, 329, 552 N.W.2d 869 (Ct. App. 1996) (quoting *Martin v. Richards,* 192 Wis. 2d 156, 175, 531 N.W.2d 70 (1995)); *see also Bubb v. Brusky,* 2009 WI 91, ¶ 62, 321 Wis. 2d 1, 768 N.W.2d 903.

carotid ultrasound could have determined whether he had suffered a TIA or small stroke rather than Bell's palsy.

¶ 307. Jury verdicts are inconsistent when the facts that must have been found by the jury in regard to one verdict are repugnant to the facts that must have been found by the jury in order to return the second verdict. *See Westfall,* 110 Wis. 2d at 92–95. A verdict that is inconsistent, "if not timely remedied by reconsideration by the jury, must result in a new trial." *Id.* at 98.[8]

¶ 308. In his action for negligent care and treatment, Mr. Jandre argued that Dr. Bullis negligently diagnosed Bell's palsy because she had not ordered a carotid ultrasound to rule out the possibility that blocked carotid arteries were causing Mr. Jandre's symptoms. In regard to the claim of informed consent, Mr. Jandre argued that he should have been told that a carotid ultrasound was an available diagnostic tool to determine whether blocked carotid arties were causing his symptoms, rather than Bell's palsy.

¶ 309. The jury instructions on informed consent also focused on the possibility that there was a more accurate diagnostic procedure than that used by Dr. Bullis to diagnose Mr. Jandre's ailment. To focus on Mr. Jandre's claim that he should have been told about a carotid ultrasound, the circuit court instructed the jury as follows:

---

[8] The tripartite rule relative to inconsistent verdicts of *Statz v. Pohl,* 266 Wis. 23, 28–29, 62 N.W.2d 556 (1954), has been abrogated as well as the court's "expressions of the approval of such rationalization for preserving and reconciling such inconsistent verdicts." *Westfall v. Kottke,* 110 Wis. 2d 86, 100, 328 N.W.2d 481 (1983).

A doctor has the duty to provide her patient with information necessary to enable the patient to make an informed decision about a diagnostic procedure *and alternative choices of diagnostic procedures*. If the doctor fails to perform this duty, she is negligent.

To meet this duty to inform her patient, a doctor must provide her patient with the information a reasonable person in the patient's position would regard as significant when deciding to accept or reject a diagnostic procedure. In answering this question, you should determine what a reasonable person in the patient's position would want to know in consenting to or rejecting a diagnostic procedure.

The doctor must inform the patient whether a diagnostic procedure is ordinarily performed in the circumstances confronting the patient, whether alternate procedures approved by the medical profession are available, what the outlook is for success or failure of each alternate procedure, and the benefits and risks inherent in each alternate procedure.

¶ 310. The underlined language in the above-quoted jury instructions, under the facts of this case, is not consistent with the law of informed consent. Even though the jury instruction may have been proper for the informed consent claim under other circumstances, given the facts of this case, it promoted the inconsistent verdicts the jury rendered. This is so because the jury instruction required Dr. Bullis to obtain Mr. Jandre's consent to forgo a diagnostic procedure that she had not recommended be done, which procedure the jury also found was not required to meet Dr. Bullis' requisite standard of care.

¶ 311. Mr. Jandre suffered no injury from any alternate diagnostic procedure that Dr. Bullis recommended and employed, yet liability for injury suffered

150

from a recommended and employed procedure is the essence of an informed consent claim. Stated otherwise, informed consent requires that a physician give sufficient information to a patient so that the patient can make an informed decision about whether to permit a recommended procedure be done to him or her. The right to give or refuse consent is grounded in a patient's right to control what will be done to his or her body. *Scaria,* 68 Wis. 2d at 12; *Martin,* 192 Wis. 2d at 169–70; *Johnson,* 199 Wis. 2d at 630; *Schreiber,* 223 Wis. 2d at 426; *Hannemann,* 282 Wis. 2d 664, ¶ 44; *Bubb,* 321 Wis. 2d 1, ¶ 69.

¶ 312. Alternate diagnostic procedures become an issue on which to ground an informed consent claim when a physician recommends and employs a procedure and the patient suffers an injury that the physician did not disclose to the patient before the procedure was performed. *Hannemann,* 282 Wis. 2d 664, ¶¶ 43–44. However, no violation of Wis. Stat. § 448.30 or the common law consistent with § 448.30 arises when a physician declines to employ an alternate diagnostic procedure, simply because that alternate diagnostic procedure may have been a more accurate diagnostic tool than the one chosen by the physician.

¶ 313. One of the central issues at trial was whether Dr. Bullis's diagnosis of Bell's palsy was negligently made because she listened for bruits in Mr. Jandre's carotid arteries rather than doing a carotid ultrasound to evaluate his carotid arteries. The jury found that Dr. Bullis's decision not to employ carotid ultrasound during her diagnosis of Mr. Jandre's ailment was not negligent. However, in order to sustain the informed consent verdict, the jury must have found that Dr. Bullis had an obligation to tell Mr. Jandre that she could have used a carotid ultrasound in her diag-

nosis of his ailment even though she chose not to do so. The jury instruction directs the jury to that conclusion when it instructs that "[a] doctor has the duty to provide her patient with information necessary to enable the patient to make an informed decision about a diagnostic procedure and alternate choices of diagnostic procedures. If the doctor fails to perform this duty, she is negligent."

¶ 314. The jury verdict places claims of informed consent in direct conflict with claims of negligent care and treatment when no injury results from the procedure employed. This is so because so long as the diagnostic procedures that were employed for the patient were "reasonable given the state of medical knowledge at that time," no negligent care can be found,[9] yet failing to advise about the use of other procedures that are not being recommended is a failure in the duty of informed consent, according to the jury verdict, given the facts of this case.

¶ 315. The verdicts rest on inconsistent factual foundations, in that the claim of negligent care and treatment and the claim of informed consent turn on the use of a carotid ultrasound. The jury found that Dr. Bullis was not negligent when she did not employ carotid ultrasound in her diagnosis, but that she was negligent in failing to obtain Mr. Jandre's consent not to employ a carotid ultrasound in her diagnosis. Therefore, under the facts of this case, the jury's verdicts required the jury to find inconsistent facts.

---

[9] The standard jury instruction employed here stated in relevant part, "If you find from the evidence that more than one method of . . . diagnosing Thomas Jandre's condition was recognized as reasonable given the state of medical knowledge at that time, then Dr. Therese Bullis was at liberty to select any of the recognized methods."

152

¶ 316. There is no claim under law for failing to inform a patient of procedures that were not recommended, when the procedures employed do not cause injury. Accordingly, the claim of informed consent should be dismissed. In addition, because the verdicts for Mr. Jandre's two claims are inconsistent, pursuant to our directive in *Westfall*, I would order a new trial on the claim of negligent care and treatment.

## III. CONCLUSION

¶ 317. The lead opinion, when combined with Justice Prosser's concurrence that affirms the court of appeals decision, holds one physician strictly liable for a missed diagnosis, contrary to the legislative directive in Wis. Stat. § 448.30 and our long-standing precedent. I also write in dissent to point out that if the lead opinion had garnered the vote of four justices for its reasoning, which it did not, the court would have imposed strict liability for missed diagnoses by expanding a patient's right of informed consent under § 448.30 from a right to be informed about the risks and benefits of treatments and procedures that *were recommended* by the physician into a right to be informed about all treatments and procedures that *were not recommended* by the physician, but which may be relevant to whether the correct diagnosis was made. Stated otherwise, the lead opinion's attempted expansion of § 448.30 would require that whenever there is a claim that the correct diagnosis of a patient's ailment was not made, a physician would be liable for failing to tell a patient about all potential diagnoses and all potential tests that could have been employed to evaluate whether different ailments were the source of the patient's symptoms. This would be an entirely new concept that the legislature did not codify when it enacted § 448.30. Accordingly, I

153

conclude that § 448.30 is not implicated in this malpractice action because there was no failure to inform the patient about the risks and benefits of the treatment and procedures that the physician employed.

¶ 318. I also conclude that under the circumstances presented the jury's finding that Dr. Bullis was not negligent in her care and treatment of Mr. Jandre is inconsistent with the jury's finding that Dr. Bullis was negligent in regard to her duty to obtain informed consent. Accordingly, I would reverse the decision of the court of appeals, and due to the inconsistency in the jury's verdicts, I would remand for a new trial on whether Dr. Bullis was negligent in her care and treatment of Mr. Jandre. Therefore, I respectfully dissent.

¶ 319. I am authorized to state that Justices ANNETTE KINGSLAND ZIEGLER and MICHAEL J. GABLEMAN join in this dissent.